902 So.2d 389 (2005)
John CHAVERS and Brenda Chavers
v.
Judy TRAVIS, Asplundh Tree Expert Company and United States Federal Insurance Company.
No. 2004-CA-0992.
Court of Appeal of Louisiana, Fourth Circuit.
April 20, 2005.
*390 Vincent L. Bowers, Morris Bart P.L.C., New Orleans, LA, for Plaintiffs/Appellees.
Kim Raines Chatelain, James J. Bolner, Jr., Berrigan Litchfield Schonekas Mann & Traina, L.L.C., New Orleans, LA, for Defendants/Appellants.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO, JR.).
PATRICIA RIVET MURRAY, Judge.
This is a personal injury action arising out of a rear-end automobile accident. John and Brenda Chavers commenced this action against the rear-ending motorist, Judy Travis; her employer, Asplundh Tree Expert Company ("Asplundh"); and her employer's insurer, United States Federal Insurance Company. As a result of the accident, Mr. Chavers claims that he aggravated his pre-existing neck and back conditions, requiring he undergo two surgical procedures; to-wit: (i) an anterior cervical disc fusion, and (ii) a surgical procedure to reinsert and reposition a dorsal column stimulator that was dislodged by the accident.[1] Mr. Chavers also claims *391 that he was required to undergo additional medical treatment, including the implantation of a morphine pump. Defendants claim that the accident had no effect on Mr. Chavers' pre-existing medical conditions and asserted in their answer to the petition that the impact was minimal, did almost no physical damage to the Chavers' vehicle, and could not have caused any injury to Mr. Chavers.
At the bench trial in this matter held in February 2004, the only live witnesses were Mr. and Mrs. Chavers and their two adult children. The documentary evidence introduced at trial included the depositions of Ms. Travis;[2] the investigating officer, Paul Golmon; Mr. Chavers' treating neurosurgeon, Dr. Thomas Flynn; Dr. Flynn's physician assistant, Darrin Couvillion; the company representative for Med-Tronics, the dorsal column stimulator manufacturer, Susan Persick; and Dr. Morgan, the orthopedic surgeon who examined Mr. Chavers for the defendants. The documentary evidence introduced also included Mr. Chavers' medical reports, records, and related bills. Defendants stipulated to the admissibility of all Mr. Chavers' medical records.
On March 2, 2004, the trial court rendered judgment in favor of Mr. Chavers, finding Ms. Travis was negligent and that "[a]lthough Mr. Chavers has a history of back problems, he has suffered debilitating injuries to his neck and back as a result of the accident. Mr. Chavers has had to undergo two surgical procedures since the accident occurred, and is still undergoing treatment for his continued pain and suffering." The trial court thus awarded general damages of $250,000.00 and special damages of $64,421.43. From that judgment, defendants appeal contesting only causation and damages.[3] For the reasons that follow, we affirm the general damages award, but amend the special damages award to reduce it to $49,375.13.

FACTS
The facts regarding the rear-end collision at issue are virtually undisputed. The collision occurred on August 23, 1999, at approximately 8:59 a.m. at the intersection of S. Range Avenue and Florida Boulevard in Livingston Parish. At the time of the accident, Mrs. Chavers, with her husband in the front passenger seat of their 1995 Chevrolet pick-up truck, was stopped at a red light, when an Asplundh company truck hit the rear of the Chavers' truck. Mounted to the rear of the frame of the Chavers' truck was a factory-installed heavy-duty, 15,000 pound trailer-towing hitch that protruded past the back bumper. The Asplundh truck, which was a small GMC Sonoma pick-up, hit that trailer hitch.
Defendants stipulated that the driver of the Asplundh truck, Ms. Travis, was in the course and scope of her employment. *392 Both Ms. Travis and the investigating officer in their depositions described the impact of the collision as minor. According to Ms. Travis, she was stopped for the red light and bending down to pick up her beeper from the floor when she heard the vehicle behind her blow the horn. While still looking down, she took her foot off the brake and the vehicle she was driving rolled forward and struck the rear of the Chavers' vehicle. After the collision, Ms. Travis testified that both she and Mrs. Chavers exited their vehicles and examined the damage to their respective vehicles. Ms. Travis testified that there was no visible damage to the Chavers' truck, but there was damage to the front bumper of the Asplundh truck.
According to Mr. and Mrs. Chavers and their son, the collision caused damage to both the outside (rear bumper and frame) and inside (driver's seat) of their truck.[4] Mrs. Chavers denied discussing the damage to the respective vehicles with Ms. Travis. She testified that the only conversation she had with Ms. Travis after the collision was responding to Ms. Travis' question as to whether she and her husband were okay. At the time of the accident, Mrs. Chavers was driving her husband to a routine follow-up appointment with Dr. John Nyboer, a pain management doctor who was treating Mr. Chavers' chronic back pain. Mrs. Chavers testified that after the accident, her husband initially appeared unconscious and that, when he did talk to her, he told her he was hurting. She described the impact as "pretty hard."
Mr. Chavers described the impact as "quite severe." He stated that when the Aspuldh truck hit the hitch on the back of their truck all the force of the impact was transferred through the frame into the truck. That force, according to Mr. Chavers, threw him back against the headrest and then forward, and then back again; he said it felt like they were hit twice. He testified that he immediately had pain in his low back, upper neck, left side of his face, left shoulder area, and left arm and that he told his wife he was hurting.
Following the accident, Mr. Chavers stayed in their truck until the ambulance arrived. He was carried out of the truck on a "back board." He was transported by ambulance to the emergency room. In the emergency room, he complained of lower back pain, which he rated as ten on a scale of one to ten. He also complained of numbness in both feet and in his left fingers. He was treated and released with instructions to follow-up with his treating neurosurgeon, Dr. Flynn.
On the way home from the hospital, Mr. Chavers informed his wife that his dorsal column stimulator had stopped working at the time of the impact. He testified that the only stimulation it was providing was in his right ankle and foot and that he told his wife that "I can't believe that the impact was so hard that it"  "that it knocked my stimulator off." Mrs. Chavers testified that she immediately called Dr. Flynn's office for an appointment to have the stimulator device checked.
On September 25, 1999, two days after the accident, Mr. Chavers was seen by Dr. Flynn's physician assistant, Mr. Couvillion, and Ms. Persick, the MedTronics representative. Unlike on prior occasions, Ms. Persick was unable to adjust the stimulator device or to make it fully operable. According to Mrs. Chavers, an x-ray was taken of Mr. Chaver's back; based on that x-ray, Ms. Persick told them that none of the wires was broken. However, the stimulator device had shifted or become dislodged. *393 Ms. Persick also informed the Chavers that, because she could not move the stimulator out of his right ankle and bring it up in his leg or right hip, Dr. Flynn would have to surgically repair or re-implant the device. According to Mr. Chavers, Dr. Flynn confirmed this fact and informed him that "an accident can, will, and does knock them out. Also [he] told me that the accident that I had knocked this one out, pulled it out of position in my spine." Mr. Chavers denied ever being told by Dr. Flynn that the x-rays did not show that the stimulator lead had moved. Mr. Chavers testified that since Dr. Flynn performed the surgical procedure the stimulator has worked similar to, and provided the same coverage as, it did before the accident.
In addition to dislodging his stimulator, Mr. Chavers testified that the accident aggravated his pre-existing neck condition. He testified that after the accident he noticed a change in his symptoms. He began having severe headaches and pain in his left arm, which he attributed to a nerve in his arm. He also had increasing numbness in his left arm. Mr. Chavers testified that Dr. Flynn referred him to Dr. Steven Zuckerman for a nerve-conduction study. He further testified that Dr. Zuckerman informed him that the test revealed that the pain and numbness in his left arm was because "that nerve was being completely pinched off in my neck because of the wreck" and that surgery was required to correct that condition.
Although before the accident Mr. Chavers had experienced neck pain, Mr. and Mrs. Chavers testified that Dr. Flynn had never informed them that he needed surgery for his neck condition. To the contrary, they testified that after Mr. Chavers began having neck problems about a year before the accident, Dr. Flynn informed him that the chances of conservative treatment being effective were excellent and had started him on a home cervical traction program in February 1999. Mr. Chavers testified that although the home traction program did not relieve all of his neck pain, it made it manageable. Mr. Chavers testified that he tried the home traction program after the accident, but it did not work.
Due to his increased pain, Mr. Chavers testified that had to undergo a cervical disc fusion within months after the accident. He denied ever being told by Dr. Flynn that at his weekly Neuroscience Conference[5] the doctors had compared the pre-accident and post-accident MRIs of his cervical spine and found them to be virtually the same. Rather, Mr. Chavers testified that he recalled Dr. Flynn telling them that "he looked at before the wreck and the one after the wreck, and he told my wife and I both in his office that there was quite severemore damage after the wreck than before." Mr. Chavers also denied that his neck pain was getting progressively worse up until the point of the accident. Rather, he testified that before the accident his neck pain was taken care of by the home traction program and that he was not a surgical candidate for his neck pain.
Both Mr. and Mrs. Chavers testified that before the accident Mr. Chavers' primary problem was his back problem, not his neck problem. They also both testified that the principal reason for Mr. Chavers being declared disabled was his prior back surgeries, not his neck condition. Mr. Chavers, who was forty-nine years old on *394 the date of the accident, was already limited in his abilities. Although Mr. Chavers became disabled in the 1990s so that he was not employed at the time of this accident, he performed a number of activities around the property where he and Mrs. Chavers resided, and on which they operate a trailer park. The Chavers and their two adult children testified regarding the negative impact the accident had on Mr. Chavers' already limited abilities. Mrs. Chavers testified that after the accident his level of participation in daily activities was reduced substantially so that he could not do much a majority of the time. Mr. Chavers testified that, as of the time of trial, he still was under the care of Dr. Flynn and a pain management doctor.

DISCUSSION
A plaintiff in a personal injury case has the burden of proving by a preponderance of the evidence that the accident more probably than not caused a claimed disabling condition. Jones v. Peyton Place, Inc., 95-0574, p. 12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763. The test for determining the causal relationship between an accident and a subsequent injury is whether the plaintiff proved through medical or lay testimony that it is more probable than not that the subsequent injuries were caused by the accident. Maranto v. Goodyear Tire & Rubber Co., 94-2603, p. 3 (La.2/20/95), 650 So.2d 757, 759; Jones, 95-0574 at p. 13, 675 So.2d at 763.
Whether the accident caused the plaintiff's injuries is a factual question that is reviewed under the manifest error standard of review. See American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); see also Guillory v. Insurance Co. of North America, 96-1084, p. 1, n. 1 (La.4/8/97), 692 So.2d 1029, 1036 (Lemmon, J., concurring)(noting that "there are often factual issues in a review of an award of general damages, such as whether a certain condition was caused by the tort.") Under the manifest error standard, a "reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
It is a well-settled principle that a tortfeasor takes his victim as he finds him and is liable for all the natural and probable consequences of his negligent acts. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). "The defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant." Id. "When the defendant's tortuous conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation." Lasha, 625 So.2d at 1006. This is referred to as the "egg shell" plaintiff principle. Under this principle, "[a]n injured person is entitled to recover full compensation for all damages that proximately result from a defendant's tortuous act, even if some or all of the injuries might not have occurred but for the plaintiff's preexisting physical condition, disease, or susceptibility to injury." 2 Stein on Personal Injury Damages 3d § 11.1 ("Stein"). The defendant must take the victim as he finds him or her. The plaintiff, however, is required to establish a causal link between the tortious conduct and the aggravation of his pre-existing condition. If the evidence establishes that a plaintiff's pre-accident and post-accident conditions are identical in all *395 meaningful respects, the plaintiff has failed to carry his burden of proving causation. Juneau v. Strawmyer, 94-0903, p. 8 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1300.
Differentiating between damages caused by an accident and damages caused by the normal progression of a plaintiff's pre-existing condition often presents complex legal and medical issues. Stein, supra, § 11.1. The analysis of such complex issues can be simplified by breaking it down into a series of five subsidiary issues; to-wit:
(1) What was the plaintiff's actual physical or mental condition at the time of injury?
(2) What was the plaintiff's actual physical or mental condition in the pertinent period following the accident?
(3) To what extent, if any, would the pre-existing condition have worsened or otherwise become more symptomatic in the absence of trauma?
(4) What was the nature of the impact of the alleged tortious act on the plaintiff's pre-existing status?
(5) Can the plaintiff's condition at the time of trial be attributable wholly or partially to the incident which allegedly aggravated the pre-existing condition?
The answer to issue (5) must be "yes" to permit liability to be imposed against the alleged tortfeasor for aggravation injuries, and the answer to that determinative issue rests on the analysis required to supply the answers to issues (1)-(4).
Williams v. Patterson, 681 A.2d 1147, 1150-51 (1996) (quoting M. Minzer, et al., Damages in Tort Actions, Vol. 2 § 15.32[4], at 15-71 to 15-72); Stein, supra, § 11.1 (noting that "[c]ases involving pre-existing conditions can be divided into three parts, the prior condition, the recovery period (if any), and the subsequent injury.") Given the complexity of the issue, this analysis generally turns on expert medical evidence. See Williams, 681 A.2d at 1150-51. Indeed, expert medical testimony is required when the conclusion regarding medical causation is one that is not within common knowledge. Hutchinson v. Shah, 94 0264, p. 3 (La.App. 1 Cir. 12/22/94), 648 So.2d 451, 452 (citing Lasha, 625 So.2d at 1005).
With the above principles in mind, we must determine whether Mr. Chavers met his burden of proving causation in this case. To provide a framework for comparing Mr. Chavers' neck and back conditions before and after the accident in question, it is necessary that we first outline in detail the medical testimony and documentary evidence presented regarding Mr. Chavers' conditions.

MEDICAL EVIDENCE
From 1995 through the date of trial, Mr. Chavers was under the care of Dr. Flynn, his treating neurosurgeon, for his pre-existing back condition. Dr. Flynn testified by deposition that he first saw Mr. Chavers in October 1995 and that his initial diagnosis of Mr. Chaver's back condition was spinal stenosis or narrowing of the spinal canal from degenerative disc disease or degenerative spine disease. On December 12, 1995, Dr. Flynn performed a decompressive laminectormy on Mr. Chavers. On February 14, 1996, Mr. Chavers saw Dr. Flynn and complained of increasing low back pain "very reminiscent of his preoperative pain." On that visit, Dr. Flynn noted that Mr. Chavers was continuing to work at his family-owned business (a bus conversion business) doing only office work.
In April 1996, Dr. Flynn noted that Mr. Chavers had begun to experience continued pain in his legs and had shown minor *396 improvement from the first surgery. On June 18, 1995, Dr. Flynn ordered an epidural steroid injection, which did not help Mr. Chavers' pain. On July 30, 1996, Dr. Flynn presented Mr. Chavers' case at the weekly Neuroscience Conference; the doctors' consensus was that he had developed a facet joint cyst (or Tarloft cyst), which was compressing the L5 nerve root, following the first surgery. On August 26, 1996, Dr. Flynn operated to remove that cyst. On March 6, 1997, Dr. Flynn noted that Mr. Chavers was seeing Dr. Rodrigue, an anesthesiologist who specializes in pain management, and Dr. Rodrigue had discussed with Mr. Chavers a dorsal column stimulator implant for his pain. Dr. Rodrigue's report dated February 25, 1997, noted that Mr. Chavers might make a good candidate for the dorsal column stimulation given that "he is a very legitimate man, very fit, and intelligent" and given that his pain is primarily in his legs. Dr. Rodrigue, however, further indicated that all conservative options should first be exhausted. Likewise, Dr. Flynn indicated that neither he nor Mr. Chavers were very anxious to try this stimulator device as it had been less than a year since the second surgery.
On July 14, 1997, Dr. Flynn testified that Mr. Chavers informed him that all of his pain had returned and that he was taking six to eight Loritab pills a day for pain and that he contacted Dr. Rodrigue to initiate the evaluation process required for a stimulator implant. On January 15, 1998, Dr. Flynn noted that Mr. Chavers was still having a problem with pain and that he made a direct referral for a stimulator implant trial. On March 10, 1998, Mr. Chavers had that stimulator trial. On May 1, 1998, Dr. Flynn performed the stimulator implant surgery. On May 25, 1998, Dr. Flynn saw Mr. Chavers, and his staff adjusted the stimulator device. Dr. Flynn testified that such adjustments to the stimulator are normal and customary. Dr. Flynn noted that Mr. Chavers pain medication was cut in half following the stimulator implant, which indicated that the stimulator was working satisfactorily.
On June 1, 1998, Mr. Chavers, at Dr. Flynn's request, first saw Dr. Nyboer, a pain medication doctor, for a physical medicine and rehabilitation consultation for pain management. Dr. Nyboer's report noted that Mr. Chavers underwent a stimulator implant and that "[h]e has now noted significant improvement in his symptoms." He further noted that Mr. Chavers uses the stimulator about seventeen hours a day and leaves it off at night while sleeping. Dr. Nyboer opined that "[t]he stimulator has helped to decrease his overall medication usage," and he opined that "it is appropriate for him to continue to use this device." Dr. Nyboer also switched his pain medication to Oxycontin.
On July 1, 1998, Dr. Nyboer saw Mr. Chavers and noted that he "continues to use the spinal stimulator, almost continuously. His pain does remain radiating into the right lower extremity." He further noted Mr. Chavers' physical exam was essentially unchanged.
On July 30, 1998, Dr. Nyboer again saw Mr. Chavers who complained that the Oxycontin was not lasting long enough for pain control. Dr. Nyboer noted that: (i) Mr. Chavers was having breakthrough pain,[6] (2) "[h]e still does not gain much benefit from the neurostimulator," and (3) he plans to follow-up with Dr. Flynn to possibly *397 have it re-adjusted. Dr. Nyboer increased Mr. Chavers' Oxycontin dosage.
On August 26, 1998, Mr. Chavers saw Dr. Flynn and reported that he had developed burning and weakness in his right leg, especially when his stimulator is off. Dr. Flynn found Mr. Chavers to be neurologically intact and recommended that he continue following up with Dr. Nyboer.
On October 5, 1998, Mr Chavers saw Dr. Mitchell, another pain management doctor. On this occasion, Mr. Chavers complained of continued pain in his right leg, despite having a dorsal column stimulator. He also stated that he had to run the stimulator on ten (which is the maximum setting) in order to get some relief down his leg; however, he indicated that the stimulator appeared to be covering the involved areas. Dr. Mitchell's pain management plan listed the consideration of a morphine pump as an option to consider if other suggested procedures were not effective. Dr. Mitchell noted that he gave Mr. Chavers a brochure on the morphine pump.
On January 13, 1999, Dr. Flynn next saw Mr. Chavers. On that visit, Mr. Chavers complained of pain in his left leg, which he characterized as identical to the pain he had experienced on his right side. On that visit, Mr. Chavers first elicited complaints of neck pain as well as left shoulder and arm pain that he related as having been present for several weeks. Dr. Flynn stressed that no event was identified as causing the onset of this neck pain. Dr. Flynn testified that his examination of the neck and upper extremities was normal. Dr. Flynn ordered a CAT scan of Mr. Chavers' cervical spine. That CAT scan showed disc herniations at both C3-4 and C5-6 with some evidence of compression of the nerves at that level. Dr. Flynn considered these problems to be degenerative spine disease or degenerative disc disease. Dr. Flynn testified that a person can have a herniated disc with nerve compression, such as Mr. Chavers had, yet not have symptoms.
On February 1, 1999, Mr. Chavers saw Dr. Flynn. At this visit, Dr. Flynn emphasized to Mr. Chavers that he thought the chances of conservative treatment of his cervical spine problem being effective were excellent and started him on a home cervical traction program. Dr. Flynn testified that at that point Mr. Chavers was not a surgical candidate for his neck condition. On his next visit, Mr. Chavers saw Dr. Flynn's physician assistant, Mr. Couvillion, and reported to him that as a result of the traction program his arm pain was significantly improved, yet he was still having significant pain around his left shoulder blade. He still was taking Oxycontin for his lower back problems, which Dr. Nyboer had prescribed.
On April 6, 1999, Mr. Chavers saw Dr. Flynn and reported that his neck pain was not better as a result of the conservative treatment (home traction program). Dr. Flynn recommended that he see Dr. Nyboer for a cervical epidural steroid injection. On April 26, 1999, Dr. Nyboer saw Mr. Chavers who reported: (a) he had been using the home cervical traction device, and it had helped some with the neck pain; (b) he still had "radicular pain radiating into the left upper extremity;" and (c) his back pain was "fairly stable," but bothers him throughout the day. Dr. Nyboer's impressions were that Mr. Chavers had cervical spondylosis with two cervical disc herniations and upper extremity pain and chronic low back pain. Dr. Nyboer ordered: (i) Mr. Chavers be referred, as Dr. Flynn had recommended, to Dr. Mitchell for a cervical epidural steroid injection for his neck and upper extremity pain; (ii) continue on his current pain medication, Oxycotin; and (iii) return in ninety *398 days to see him for a follow-up appointment. Dr. Nyboer also provided Mr. Chavers with a certificate of mobility impairment for a handicapped license, which indicated that he considered Mr. Chavers permanently impaired with regard to mobility based on his multiple medical problems.
In correspondence dated June 4, 1999 and addressed to the attorney handling Mr. Chavers' disability claim, Dr. Nyboer opined that Mr. Chavers was permanently disabled from gainful employment due to his current medical problems, which he enumerated as being "multiple lumbar surgeries" and "cervical spondylosis with two cervical disc herniations resulting in upper extremity pain."
On June 16, 1999, Dr. Flynn saw Mr. Chavers for the last time before the accident in question. Dr. Flynn agreed that the conservative therapies appeared to be working as anticipated; that Mr. Chavers was not a surgery candidate for his neck condition; and that the dorsal column stimulator was working properly, despite the need for normal periodic programming and adjustment.
On July 22, 1999, a month before the accident, Mr. Chavers saw Dr. Mitchell, the pain management doctor. Dr. Mitchell noted that Mr. Chavers reported "continued pain in his low back and right leg" and rated that pain as a seven out of ten. As to the dorsal column stimulator, Dr. Mitchell noted that it was last programmed in July 1999 and that Mr. Chavers reported it "has helped his pain significantly, but he continues having severe pain." In his pain management plan, Dr. Mitchell "encouraged" Mr. Chavers to consider a morphine pump. He further stated that:
He is on sufficient pain medications and continues having severe pain. Even with a dorsal column stimulator, he has severe pain. I feel the combination of the pump and the dorsal column stimulator will give him the most amount of relief. I, therefore, will proceed with scheduling a morphine pump education visit with Sharon Landry, RN and attempt to obtain approval from Foundation Health [the Chavers' health care provider] for a morphine pump trial where we will put in an epidural catheter for a period of three days and determine if he will tolerate epidural narcotics. If he obtains relief from the epidural narcotics we will have him see Dr. Flynn for pump implantation.
As noted earlier in this opinion, on August 23, 1999, the date of the accident, Mr. Chavers was treated in the emergency room and released. His diagnosis was a lumbar strain. Two days later, on August 25, 1999, Mr. Chavers was seen by Dr. Flynn's physician assistant, Mr. Couvillion, and the MedTronics representative, Ms. Persick. Although Ms. Persick attempted to reprogram the stimulator, she was unable to do so. Before the accident, she had done so several times as part of the routine adjustment of the stimulator device. At that office visit, x-rays were taken that revealed the lead to the stimulator device was intact.
On August 26, 1999, Dr. Mitchell's office noted that Mrs. Chavers had telephoned them and informed them of the recent motor vehicle accident and the displacement of the dorsal column stimulator lead. They further noted that Dr. Flynn's physician assistant, Mr. Couvillion, informed them that the lead needed to be repositioned, but Dr. Flynn wanted Dr. Mitchell to proceed with the scheduled morphine pump trial. They still further noted that Dr. Flynn had indicated that if the morphine pump controlled Mr. Chavers' pain, he might consider removing the stimulator device.
*399 On September 7, 1999, two weeks after the accident, Mr. Chavers was admitted by Dr. Mitchell into the hospital for the three-day, scheduled morphine pump trial. During that admission, Mr. Chavers acknowledged that he told Nurse Landry that he felt the best he had felt in four years. In the discharge summary dated September 9, 1999, Dr. Mitchell stated that Mr. Chavers described his pain on the date of discharge as a one out of ten and that he had excellent pain relief. However, Dr. Mitchell noted:
The only place he hurt was on his right foot and right calf. This was the area that had previously been covered by the dorsal column stimulator prior to the motor vehicle accident. Since the recent motor vehicle accident, the patient has had pain in this area. I discussed with them the possibility of Dr. Flynn repositioning the dorsal column stimulator lead at the same time of placing the Morphine pump. This I will leave up to Dr. Flynn's discretion.
On September 14, 1999, Mr. Chavers saw Dr. Nyboer and related the following: (i) his pain symptoms had increased recently, (ii) his stimulator was not working as well as he would like, (3) he continued to be bothered with significant right leg pain, and (4) he had ongoing pain in his upper back and neck. Mr. Chavers, however, told him that his neck pain was not as severe as his lower back pain. Dr. Flynn testified that according to Dr. Nyboer's notes from that date, they had agreed, by telephone, to reposition Mr. Chavers' stimulator lead surgically to try to obtain better pain relief and because of his continued use of Oxycotin they had discussed a morphine pump placement.
On September 29, 1999, Dr. Flynn performed the operation to reposition the dorsal column stimulator, which his invoice described as "implant revision and/or removal of spinal electrodes." In his notes in the hospital record dated September 29, 1999, Dr. Flynn indicated that Mr. Chavers' dorsal column stimulator "was providing adequate coverage until a recent motor vehicle accident seemed to move his lead." In that same operation, Dr. Flynn put in the morphine pump. On October 8, 1999, Dr. Flynn saw Mr. Chavers for a post-operative check and noted that the stimulator device was functioning better. On that visit, the stimulator was readjusted. November 2, 1999, Dr. Flynn saw Mr. Chavers and noted that the morphine pump was doing well. Dr. Flynn recommended that he follow-up with Dr. Mitchell, the pain management doctor. At neither of those two post-operative visits did Mr. Chavers complain about neck pain.
On December 14, 1999, Mr. Chavers was seen by Dr. Flynn to have his stimulator adjusted. On that visit, Dr. Flynn noted that Mr. Chavers was doing well, but he recently had been experiencing bitter neck and shoulder pain. According to Dr. Flynn, this was the first time that Mr. Chavers complained "bitterly" of pain in his neck and shoulder girdle. Dr. Flynn referred Mr. Chavers to Dr. Zuckerman for a nerve-conduction study.
On January 24, 2000, Dr. Zuckerman saw Mr. Chavers, who complained predominantly of neck and paraspinous pains with pain down the arms. Dr. Zuckerman ordered an EMG/Nerve Conduction study. The EMG/Nerve Conduction Study was done on January 31, 2000. That study revealed mild ulnar neuropathy and possible C6 radiculopathy.
On February 3, 2000, Mr. Chavers saw Dr. Flynn. On that date, Mr. Chavers complained that he was experiencing progressive neck, left shoulder and arm pain. Dr. Flynn noted that "there had been a definite increase in symptoms since his motor vehicle accident and the scan done *400 at the Lake [the hospital] which had been done more recently demonstrated progression of his cervical disc rupture or herniation." Dr. Flynn also noted he wanted to compare that scan with the one done the prior summer and to present Mr. Chavers' case at his weekly Neuroscience Conference. Dr. Flynn testified that he did not consider this increase in symptoms as warranting surgery at that point and stressed that the last thing he wanted to do was to operate on Mr. Chavers again given "his very poor result with the back surgery principally."
On February 7, 2000, Dr. Flynn noted the results of presenting Mr. Chavers' case at the Conference that day were as follows:
John Chavers was presented at our Monday neuroscience conference and his case was discussed, including comparison of his MRI from last summer. It is really unchanged structurally. He does have a C5, 6 disc herniation with some degenerative change and we are going to recommend a C5, 6 ACDF.[7]
The following day Dr. Flynn reported to the Chavers the results of the conference and scheduled the surgery; on February 25, 2000, Dr. Flynn performed the surgery, which, according to Dr. Flynn's testimony, was a success. As noted, Mr. Chavers remained under the care of Dr. Flynn and a pain management doctor at the time of trial.
The central issues presented in this appeal are whether the August 23, 1999 accident was the cause of the aggravation of Mr. Chavers' pre-existing neck and back conditions; the extent of that aggravation, if any; and the necessity of the three surgical treatments for those injuries. We separately address the causation issue as it pertains to each of these three surgical treatments allegedly necessitated by the accident; to-wit: (i) cervical disc fusion, (ii) repositioning of the dorsal column stimulator, and (iii) insertion of the morphine pump.

(i) cervical disc fusion
Defendants contend that the trial court was manifestly erroneous in finding that Mr. Chavers met his burden of establishing that the accident caused the need for his cervical disc fusion. Defendants stress Dr. Flynn's refusal to opine that "but for" the accident Mr. Chavers would not have required a cervical disc fusion. Particularly, defendants quote the following testimony from Dr. Flynn's deposition:
Q. Doctor, given Mr. Chavers' history and the degenerative condition of his spine, can you rule out the fact that he would have one day needed cervical fusion in the neck due to degenerative condition as opposed to the auto accident?
A. No, sir.
Q. You can't rule that out?
A. No sir. He was at risk because of his degenerative spine disease of some risk of eventually having to have surgery.
Defendants also quote Dr. Flynn's testimony that he could not say whether it was more likely than not that Mr. Chavers would have required surgery but for this accident. Dr. Flynn testified that "[b]ecause [Mr. Chavers] did have clinically significant at least from a radiographic standpoint degenerative spine disease. I don't know whether he would eventually would have had surgery or not. It is a possibility."
Defendants' argument is based on the premise that medical certainty is required to establish medical causation. However, *401 that is not the correct standard. The plaintiff's burden of proving causation is satisfied if medical evidence is presented establishing that it is more probable than not that the claimed condition was caused by the accident. Jones, 95-0574 at p. 13, 675 So.2d at 763; Maranto, 94-2603 at p. 3, 650 So.2d at 759. This standard was satisfied by Dr. Flynn's testimony that it was more probable than not that the cervical disc fusion was related to the accident. Dr. Flynn opined based on the history and examination and his treatment of Mr. Chavers that it was more likely than not that the accident caused the need for Mr. Chavers to undergo an anterior cervical fusion.
The only evidence defendants cite to the contrary is the testimony of their expert, Dr. Morgan, who opined that the accident was a minor one that did not cause "any injury of any significance to the cervical spine that pushed [Mr. Chavers] over the brink" so as to require cervical spine surgery. However, Dr. Morgan's opinion was based, in part, on expert testimony on "force-of-impact" that defendants did not introduce. Although Dr. Morgan also relied on Ms. Travis' deposition testimony to conclude the impact was minor, this court has recognized the principle that courts should avoid measuring an injury in direct proportion to the force of the collision when the medical and lay witnesses establish the plaintiff sustained injury. See Starnes v. Caddo Parish School Bd., 598 So.2d 472, 477 (La.App. 2d Cir.1992); Seegers v. State Farm Mutual Auto. Ins. Co., 188 So.2d 166, 167 (La.App. 2d Cir.1966). Given these factors, we cannot say the trial court erred in finding Dr. Morgan's testimony unpersuasive.[8]
Defendants emphasize the fact that the comparison of the MRIs from before and after the accident showed no structural change in Mr. Chavers' neck condition. Defendants also emphasize Dr. Flynn's testimony that the reason he did not order neck surgery before the accident was not because Mr. Chavers' neck condition did not warrant it, but rather because the last thing he wanted to do was to operate on Mr. Chavers again given "his very poor result with the back surgery principally."
We find the record supports the trial court's finding of causation as to the cervical disc fusion. The medical evidence reflects that before the accident Mr. Chavers neck condition was stable and manageable. According to the treating neurosurgeon, Dr. Flynn, Mr. Chavers' chance of recovery with conservative treatment was excellent. Following the accident, Mr. Chavers reported in the emergency room that he had numbness in his left hand. According to Mr. Chavers, this was the first time he experienced such numbness. Dr. Flynn opined this symptom was consistent with an aggravation of his neck condition. Dr. Flynn testified that December 14, 1999, which was after the accident, was the first time Mr. Chavers used the term "bitterly" to describe his neck pain. Finally, Dr. Flynn's comment regarding his hesitancy to operate on Mr. Chavers again was made in response to a question regarding his post-accident treatment of Mr. Chavers.[9]

*402 (ii) repositioning of the dorsal column stimulator
Defendants argue that the trial court erred in finding the accident caused the need to surgically reposition the dorsal column stimulator. In support, defendants note that before the accident the dorsal column stimulator was not very effective in controlling Mr. Chavers' back pain. They stress that this is evidenced by Mr. Chavers' continued pain complaints, which necessitated an increase of his prescription pain medication and that a morphine pump be prescribed. Defendants also stress that there was no objective evidence in the x-ray that was taken following the accident that the dorsal column stimulator was dislodged.
Mr. Chavers, on the other hand, contends that he proved the impact from the accident caused his stimulator to be dislodged and that this gave rise to the necessity for the repositioning surgery. Whether the accident dislodged the stimulator or otherwise rendered the stimulator less effective and caused the need for the surgery to reposition it turns on whether there was an aggravation of Mr. Chavers' pre-existing back condition. We find Mr. Chavers met his burden of proving such an aggravation.
First, Dr. Flynn's testimony that the surgical procedure to reposition the stimulator was caused by the accident was sufficient to satisfy Mr. Chavers' burden of proving causation. Dr. Flynn testified as follows:
Q. Given the history and the findings, doctor, is it your opinion that more likely than not the cause of your having to reposition the dorsal column stimulator was the automobile accident Mr. Chavers was involved in in 1999?
A. It is.
Dr. Flynn further testified that traumatic events, like motor vehicle accidents, can cause the migration of dorsal column stimulators. He still further testified that the combination of Mr. Chavers' complaints regarding ineffective coverage and the fact he was in an accident was a basis for him to conclude there could be a migration problem.
Second, Mr. Chavers was suffering from a pre-existing back problem for which he had undergone multiple surgeries and was being treated. The dorsal column stimulator had assisted, albeit not eliminated, his pain and his ability to live with his condition, and his condition was made worse by the accident. "[A]n injury may make the disease materially more difficult to control or may result in complications. Such a result is properly described as an aggravation of the pre-existing condition." Stein, supra., § 11:1. The record supports the trial court's finding that Mr. Chavers met his burden of establishing causation as to this surgical procedure.

(iii) implant of the morphine pump
Defendants' argument as to the morphine pump is that the trial court erred in including the medical expenses related to the pump in the special damage award. We agree. A plaintiff's recovery of medical expenses is limited to those expenses related to the accident. Harper v. Garcia, 32,142, p. 9 (La.App. 2 Cir. 8/18/99), 739 So.2d 996, 1003. As discussed below, the morphine pump was not related to the accident.
Unlike the other two surgical procedures, Dr. Flynn was not asked to relate the procedure to implant the morphine pump to the accident. Indeed, the argument *403 Mr. Chavers makes regarding the morphine pump is that it is an additional treatment for his increased back pain that was caused by this accident. Mr. Chavers claims that the morphine pump was not prescribed until after the accident. In support, he cites Dr. Mitchell's report in which he recommends that the pump be considered as a last resort if other treatment options are unsuccessful. However, Dr. Mitchell's later July 1999 report expressly states that he was scheduling the morphine pump trial. In that July 1999 report, Dr. Mitchell also recommends that the pump, stimulator device, and pain medication together would be the best method of controlling Mr. Chavers' chronic back pain. We further note that Mr. Chavers acknowledged that he was not claiming that the accident caused the need for the morphine pump. Likewise, Mrs. Chavers testified that the morphine pump was something that had been planned for months before the accident. Given these facts, we cannot relate the morphine pump to this accident.
Given our finding that the morphine pump was not related to the accident, it was error for the trial court to include in the special damages award the expenses for the morphine pump. We thus exclude the expenses for the morphine pump trial of $1,914.30. However, as to the expenses for the surgery in which the morphine pump was implanted and the dorsal column stimulator was reinserted, we find it impossible to apportion exactly the costs. For that reason, we exclude only the major expense for the pump itself, which was $13,132.00. In so doing, we hold that the general rule, which defendants cite, that the burden of establishing entitlement to medical expenses is on the party seeking them is inapposite in this context. Instead, we find it appropriate to place the burden on the defendants who are seeking to apportion the costs of the procedure that was partially related to the accident. See Stein, supra, § 11:16 (noting that "when the plaintiff proves that the accident aggravated a preexisting condition, but fails to introduce evidence of any basis for apportionment, the defendant has the burden of going forward with the evidence to establish apportionment.") For these reasons, we amend the trial court's judgment to decrease the special damages award by $15,046.30 ($1,914.30 for pump trial and $13,132.00 for cost of the pump).
The defendants' contention that the trial court erred in the award of general damages is based upon their contention that there was no causal relationship between the accident and the aggravation of Mr. Chavers' pre-existing back and neck conditions. As discussed above, we find this argument unpersuasive.

DECREE
For the forgoing reasons, the judgment of the trial court is amended to reduce the award of special damages to $49,375.13. As amended, the judgment of the trial court is affirmed.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] A dorsal column stimulator is a pain management tool often used in chronic back pain patients. As Dr. Thomas Flynn, Mr. Chavers' treating neurosurgeon explained, "a dorsal column stimulator is a device that is implanted over the spinal cord that generates an electrical current that passes into the spinal cord and excites the release within the spinal cord of a substance called an endorphin that is naturally occurring morphine like substance and it blocks the transmission of pain within the spinal cord."
[2] The defense established their inability to have Ms. Travis appear at trial by introducing the certified letter they sent her that was returned undelivered.
[3] Mrs. Chavers also claimed she suffered personal injuries in the accident. The trial court awarded her $3,000.00 in general damages, $971.00 in special damages, and $2,500.00 for her loss of consortium. Because defendants do not challenge their liability for the damages awarded to Mrs. Chavers, we focus solely on defendants' liability for the damages awarded to Mr. Chavers.
[4] The Chavers' petition does not include a property damage claim, and the record does not include a copy of the property damage estimate for the Chavers' truck.
[5] This is a meeting with a group of neurosurgeons that Dr. Chavers attends every Monday. At these meeting, the doctors discuss cases. On at least two occasions, Dr. Flynn presented Mr. Chavers' case at one of these meetings.
[6] Dr. Flynn defined breakthrough pain to mean that "with the combination of the stimulator and the pain medication that the patient still has pain that is breaking through those measures." Dr. Flynn testified that a patient can still have breakthrough pain even when their stimulator is operating properly.
[7] ACDF stands for anterior cervical discectomy with fusion.
[8] Defendants argue that Mr. Chavers' case on causation rests solely on the fact that Dr. Flynn had not ordered the neck surgery before the accident. Defendants contend that by finding causation the trial court apparently relied on the Housley v. Cerise, 600 So.2d 646 (La.1992) presumption of causation, which is inapplicable given Mr. Chavers clearly was not in "good health" before the accident. Mr. Chavers acknowledges that the presumption does not apply and contends that the trial court did not rely on the presumption of causation. We agree.
[9] Defendants cite Hutchinson v. Shah, 94 0264 (La.App. 1 Cir. 12/22/94), 648 So.2d 451, for the proposition that Dr. Flynn's testimony on medical causation previously has been found to be insufficient. Defendants' reliance on that case, however, is misplaced. In that case, Dr. Flynn was neither the treating physician, nor a consulting physician. Moreover, in that case, Dr. Flynn declined to render an opinion that it was more probable than not that the fall caused the stroke.