MADELEINE M. LANDRIEU, Judge.
liThe defendants: U-Haul International, Inc.; U-Haul Company of Georgia; and Azhar M. Khan d/b/a CITGO Snack and Pack [hereinafter collectively referred to as “U-Haul” or “the U-Haul defendants”], appeal the trial court’s judgment, which found them ninety percent at fault for damages suffered by the plaintiffs, James and Caroline Gaunt, as a result of an accident involving a U-Haul auto transport. For the reasons that follow, we affirm in part and reverse in part.
FACTS AND PROCEEDINGS BELOW
On December 29, 2005, Mr. Omar Erazo was driving a rented U-Haul van on Interstate 10 and towing his Ford F-150 truck on a U-Haul auto transport when the truck suddenly came off the transport and collided with Mr. Gaunt’s vehicle. Mr. Erazo had rented the U-Haul van and auto transport to move his belongings back to the New Orleans area after having been displaced to Georgia as a result of Hurricane Katrina. After calling U-Haul’s 1-800 line to reserve the van and transport, Mr. Erazo had picked up the equipment from a U-Haul dealership located inside a CITGO Snack and Pack, which was owned and operated by Azhar 12Khan. It is undisputed that Mr. Erazo’s Ford truck exceeded the size and weight recommended by U-Haul for towing on this type of auto transport;[1] nevertheless, the truck did fit on the transport such that Mr. Erazo was able to secure it and proceed.[2] During the trip home, Mr. Erazo pulled into a rest stop somewhere in Mississippi to check on the tow because his wife, who had been driving her car behind the van, had seen a strap on the auto transport apparently come loose from the tire of the towed vehicle. Mr. Erazo called the U-Haul emergency number at that point and was asked if he could re-secure the strap, which he said he had done. He then was told to drive to the nearest U-Haul facility, which was approximately thirty miles north, to have the situation checked out. However, because Mr. Erazo was travel-ling in a different direction and was unwilling to drive that far out of his way, he decided to continue on to Louisiana. The accident occurred on 1-10 in eastern New Orleans near the Michoud exit. Mr. Era-zo’s truck slid off the auto transport and into the next lane, where it was struck by Mr. Gaunt’s vehicle, injuring Mr. Gaunt.
On June 19, 2006, Mr. and Mrs. Gaunt filed suit against Mr. Erazo, his insurer, Progressive Security Insurance Co. [“Progressive”], and the U-Haul defendants[3] alleging that their negligence had caused *1255 the plaintiffs to sustain [ ¡¡property damage, personal injuries, loss of income, and loss of consortium. Prior to trial, the plaintiffs settled and dismissed with prejudice their claims against Mr. Erazo and his insurer, Progressive. A bench trial against the remaining defendants was held March 28-31, 2011, in the district court.
On April 11, 2011, the trial court rendered judgment with written reasons awarding a total of $1,759,100.80 in damages to Mr. Gaunt and $36,000.00 to Mrs. Gaunt for loss of consortium. The trial court found the defendants to be at fault in the following percentages:
Omar Erazo — 10%
Azhar Khan d/b/a CITGO Snack and Pack — 10%
U-Haul Co. of Georgia — 10%
U-Haul International, Inc. — 70%
In its Reasons for Judgment, the trial court gave the following breakdown of the damages awarded to Mr. Gaunt:
(1) General Damages:
Pain and suffering — $875,000.00
Mental Anguish — $150,000.00
Permanent disability — $25,000.00
Loss of enjoyment of life — $50,000.00
Scarring — $25,000.00
(2) Special Damages:
Past medical expenses — $533,971.80
Future medical expenses — $100,000.00
Property damage — $8,100.00
The trial court specifically noted that there was insufficient evidence to justify an award of damages for past or future lost wages.
|4From this judgment, the U-Haul defendants appeal.
ISSUES
On appeal, the U-Haul defendants raise seven issues, which we have consolidated into three for the purposes of this discussion, and the plaintiffs have filed an answer to the appeal raising one additional issue, which we have designated as issue number IV. These issues are as follows:
I. Did the trial court err by conducting improper, ex parte research, and does such an error trigger de novo review by this Court?
II. Did the trial court err by assessing ninety percent of the fault to the U-Haul defendants and only ten percent to Mr. Erazo?
III. Did the trial court err by awarding an excessive amount of damages to Mr. Gaunt?
IV. Did the trial court err by awarding Mrs. Gaunt an insufficient amount for loss of consortium?
DISCUSSION
I. Allegedly Improper Acquisition of Evidence by the Trial Court
The U-Haul defendants seek a de novo review by this Court on the basis of the trial court judge’s alleged receipt of improper, outside evidence that prejudiced her verdict. They contend that during the trial, while their corporate representative Mr. James Fait was testifying on March 30, the trial court judge conducted improp *1256 er, ex parte research of adjudicative facts by instructing her law clerk via Windows instant messaging to do an online search for other accidents involving U-Haul auto transports. This request by the judge occurred after Mr. Fait had been asked by U-Haul’s counsel whether he knew of any other lawsuits in which a properly attached vehicle in tow had fallen off a U-Haul auto transport. The | ^plaintiffs’ counsel objected to the question, arguing that it would be improper to admit evidence of other accidents, and further remarked that if the question posed by U-Haul’s counsel were permissible, it would also be permissible for him (the plaintiffs’ counsel) to introduce evidence taken from so-called anti-U-Haul websites. As reflected in the transcript, the trial court then commented: “We know about the Web site. I don’t know how bad U-Haul is. I am going to sustain the objection.” At the end of that same day, U-Haul’s counsel stated that, although he knew the trial judge was aware of the existence of negative U-Haul websites, he was requesting that the trial court not view or consider the content of any such website because such information was not evidence. The trial court agreed with this request.
The next day, March 31, there was a discussion on the record in which it was revealed that, in response to the trial judge’s instant message, the judge’s law clerk had conducted a Westlaw search, presumably for the terms “U-Haul,” and “auto transport,” and that his search had resulted in 1400 hits, a fact that he had then communicated to the trial judge. The trial judge admitted on the record that, during Mr. Fait’s testimony, she had asked her law clerk to “see what was online,” in part because she was “curious,” but denied that she had looked at any of the cases, insisting that her clerk had told her only the number of cases that the search had turned up — 1400. The trial judge indicated that the law clerk could tell the attorneys the exact terms he had searched.[4]
1 (¡U-Haul’s counsel then specifically asked the trial judge to disclose what websites she had reviewed, and the judge responded that she had not reviewed any. The judge reiterated that she had not looked at any negative U-Haul websites or at any cases discovered through her clerk’s Westlaw search because U-Haul’s counsel had specifically asked her not to, and that she knew only that the search had triggered 1400 hits.
The U-Haul defendants then moved for a mistrial on the basis that trial court judge’s knowledge of potentially prejudicial information concerning prior accidents was improper.[5] U-Haul’s counsel indicat *1257 ed that another ground for his motion was that it would be improper for the court to “independently acquire ... information” or obtain evidence, or for a juror to consider such evidence. The trial court declined to grant a mistrial, giving extensive reasons on the record, as follows:
THE COURT:
I’m the fact finder. There is no juror.... I’m telling you now, I never looked at one case. We did a hit on U-Haul, at least my law clerk did, when he sent the number to me. And then the comment was made. You said, “Your Honor, I ask that you not look at that.” I respect that.... I never looked at any anti — U-Haul cases or Web sites. I saw a number. That’s what I saw. I saw 1400 something for hits on Westlaw.
* ¾: ⅜ ⅜ ⅜
MR. WILLIAMS:
|7To the extent, Judge, that the Court has heard that information or has evidence of how many lawsuits filed against U-Haul—
THE COURT:
I do not know how many lawsuits. We have a hit of U-Haul and auto tows. That’s what we have. We have a hit of cases that involve U-Haul and auto — that’s all that was sent to me. That’s a hit.
MR. WILLIAMS:
I think we both made our point, Judge.... Just for the record — and. I think it’s [the motion] already been made and ruled upon — we object. And based upon the information, foundation, hearsay evidence being submitted to the trier of fact without coming from the plaintiffs themselves—
THE COURT:
Are you telling me that you would get a mistrial if I look at this if this didn’t come from him [the plaintiffs’ counsel]?
MR. WILLIAMS:
No, Judge.
THE COURT:
This didn’t come from him, and this is outside information, right? This is a quantum book.... I’ve looked at this. So you’re telling me now that I can’t use Eason’s? You’re telling me that I can’t use Westlaw to look up quantums?
MR. WILLIAMS:
IsJudge, all I was referring to was the anti-U-Haul Web site, and that would have been information that came to the fact finder that didn’t come through counsel....
THE COURT:
I’m not sure what you’re arguing. I’m not quite sure—
MR. WILLIAMS:
Judge, I’m not addressing cases.... I was addressing the anti-U-Haul Web sites because that’s what was specifically mentioned yesterday.
THE COURT:
I don’t know anything about anti-U-Haul Web sites. I don’t know what you’re talking about. I really don’t.
*1258 MR. WILLIAMS:
I’ll just tie it up, Judge. Just for the record, we were objecting to if the court had considered or viewed U-Haul Web sites about U-Haul and the number of instances involving U-Haul. And I believe the number is 1400. And on that basis, we ask for a mistrial, and Your Honor has ruled. And we thank you for your consideration, Judge.
Prior to trial, the U-Haul defendants had filed a motion in limine to exclude evidence of other accidents, but the trial court had deferred ruling on the motion until trial, when such evidence might be offered. Although the trial court never specifically ruled on the motion, it did sustain the objection of the plaintiffs’ counsel to testimony by Mr. Fait regarding whether he knew of any prior accidents involving U-Haul auto tows. On appeal, the U-Haul defendants argue that the trial 13court “spontaneously sought out” evidence of other accidents that would not be admissible if it had been offered by one of the parties. They contend that the court “conducted its own undisclosed research which inaccurately revealed that there were as many as 1400 previous accidents involving U-Haul auto- transports.” According to their argument, this type of evidence would not be admissible under La. C.E. art. 403 because the prejudicial effect of such evidence outweighs its probative value. In support of this argument, the U-Haul defendants cite Lozano v. Touro Infirmary, 99-2587 (La.App. 4 Cir. 12/13/00), 778 So.2d 604 prior accidents, noting “the risk of prejudice associated with informing the jury of other accidents.” 99-2587, p. 4, 778 So.2d at 607(quoting Davis v. Louisiana Power & Light Co., 612 So.2d 235, 239 (La.App. 4 Cir.1992)). In addition, the appellants contend the trial court judge’s consideration of ex parte materials that she declined to disclose to the parties violates Canon 3(A)(6) of the Code of Judicial Conduct.[6] They argue that this activity by the trial court constitutes legal error that cannot be considered harmless. Essentially, the U-Haul defendants contend that the assessment of ninety percent of the fault to them is proof, in and of itself, that the finder of fact was prejudiced by the legal error, which mandates de novo review by this Court.[7]
On the basis of this record, we cannot say that the trial court committed legal error. The record demonstrates that the trial court’s law clerk conducted a *1259 hnWestlaw search, not an internet search. There is a crucial distinction between the two. The performance of a Westlaw search, a commonly-used legal research tool, is not improper.[8] In this case the trial judge insisted that she did not review any cases turned up by that search, but knew only that the search had resulted in approximately 1400 hits. Without viewing those cases, however, it would be impossible to tell the context in which the searched terms were used. As the parties’ counsel and the trial judge are aware, the fact that the terms “U-Haul” and “auto transport” appear in a published case does not necessarily indicate that the case involves facts that are in any way similar to those of the instant case. Therefore, the trial court’s mere knowledge of the number of cases turned up by a Westlaw search cannot constitute legal error. Moreover, although the trial judge denied having looked at any of those cases, if she had reviewed any, her reviewing them would not have been improper. The reviewing of published jurisprudence, on Westlaw or otherwise, is a normal component of the legal research ordinarily conducted by the court.
The U-Haul defendants argue that the trial judge, in addition to the Westlaw search, viewed so-called anti-U-Haul websites, which unduly prejudiced her and influenced her decision in this case. However, the record does not support the appellants’ contention that the trial judge viewed any outside websites or had knowledge of any inadmissible evidence. Although the judge made the remark, “We know about the Web site,” she adamantly and repeatedly denied on the record that she had seen or reviewed any anti-U-Haul websites. In light of the court’s statements on the record, we cannot conclude, on the basis of one cryptic comment |n alone, that the trial judge has acted improperly. In the absence of evidence of some improper conduct or legal error by the trial court that influenced its decision in the case, we find that the trial court did not err by refusing to grant a mistrial, and we decline to perform a de novo review on appeal.
II. Assessment of Fault by the Trial Court
The U-Haul defendants contend that the trial court committed manifest error by failing to assign a greater percentage of fault to Mr. Erazo. They contend that considering the facts adduced at trial, it was clearly wrong for the trial court to find that the U-Haul defendants, collectively, were ninety percent at fault in causing the plaintiffs’ injuries while Mr. Erazo was only ten percent at fault. Specifically, the appellants argue that this assessment of fault is not supported by any evidence showing that a breach of duty by U-Haul was a substantial cause of the accident.
Allocations of fault are reviewed according to the manifest error/clearly wrong standard enunciated in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978), and Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 971-972; Clement v. Frey, 95-1119, 95-1163, pp. 6-8 (La.1/16/96), 666 So.2d 607, 610-611. Then, once the appellate court has determined that the allocation of fault is “clearly wrong,” that court should re-apportion the fault, but only to the ex *1260 tent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Clement v. Frey, pp. 7-8, 666 So.2d at 611. In so doing, the appellate court should consider “both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.” Id., p. 8, 666 So.2d at 611 (quoting Watson, supra, at 974). The Louisiana Supreme Court in Watson cited five factors that may influence the | ^degree of fault assigned to each: (1) whether the negligent conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might have required the actor to move in haste, without proper thought. Watson, supra, p. 974.
Considering the totality of the evidence in the instant case, we agree with the appellants that the trial court’s assignment of only ten percent of the fault to Mr. Erazo, and ninety percent to the U-Haul defendants, was clearly wrong. Our conclusion is based upon the following facts adduced at trial.
Mr. Erazo testified that, after having lived in Kenner, Louisiana for fourteen years, he and his wife were displaced to Georgia due to Hurricane Katrina. In December of 2005, when they decided to move back to Kenner, Mr. Erazo called U-Haul’s 1-800 telephone line to reserve a 24-foot van and an auto transport on which to tow his truck. He told the U-Haul operator that his truck was a Ford F-150 with four doors. The operator asked him whether his truck had a crew cab. Mr. Erazo responded that he did not know, but his truck had two “big doors and two little doors.” When he had completed the reservation, Mr. Erazo was told to pick up his equipment at a nearby Citgo Snack and Pack [hereinafter “Citgo”], which contained a U-Haul dealership operated by Mr. Khan, the owner of the Citgo. When Mr. Erazo and his son went there to pick up the van and auto transport, the equipment was in the back parking lot behind the store. Mr. Erazo signed the rental contract and took the equipment back to his apartment, where he loaded the van, hooked up the auto transport, and attached his F-150 truck to the transport. Although Mr. Kahn had given him U-Haul instructions manuals with | isthe equipment, Mr. Erazo testified that he did not remember whether he had looked at them, but that he knew how to attach the truck because “[T]here’s only one way to put it on.” He testified that he had used an auto transport once before. He wrapped the straps over the tires and ratcheted them down. He also attached a chain to the front axle of his truck.[9] Mr. Erazo testified that the straps “kind of’ fit around the tires, but the fit was “tight,” and there was only about one inch between the back of his truck and the edge of the transport. Mr. Erazo stated that, because the fit did not look right to him, he drove the van and auto transport with the attached truck back to the Citgo, where Mr. Kahn assured him that U-Haul would not have *1261 rented the auto transport to Mr. Erazo if it was not right for his truck. Mrs. Erazo testified that the truck appeared to be too big for the auto transport and confirmed that her husband drove back to the Citgo to have it checked, but stated that she did not go with him. She testified that when Mr. Erazo returned, he told her that the auto transport “was the only one they had, so we had to take it anyway.” Mrs. Erazo also testified that her husband said that “the gentleman [Mr. Khan] said it [the auto transport] was ok for the truck.”
Mr. Erazo then proceeded on his way to Louisiana, with his wife driving behind him in her vehicle. Mr. Erazo testified that somewhere on Highway 59 in Mississippi, his wife called him on his cell phone and said she had noticed that his truck was slipping out of the straps on the auto transport. Mrs. Erazo corroborated this testimony, stating that she had seen the truck move. Mr. and Mrs. Erazo then pulled over at a rest stop, where Mr. Era-zo called U-Haul and reported the | ^problem. He testified that he believed both straps had come loose, because the truck had moved. The U-Haul representative asked Mr. Erazo if he could re-secure the straps. He replied that he had already done so. He testified that he had gotten in his truck, had driven it forward a little, and then had re-strapped it. The U-Haul representative then advised Mr. Erazo to drive approximately thirty to thirty-five miles north to the nearest U-Haul center. However, because Mr. Era-zo’s destination was in the opposite direction, and he felt as if he was close to home, he decided to continue on to Ken-ner. Mr. Erazo testified that he was “just furious” when the U-Haul telephone operator told him to drive thirty-five miles in the wrong direction, so he “just blew off’ her instructions and decided instead to drive really slowly. Mr. Erazo got back on the interstate driving more slowly than before, with his emergency flashers on, after telling his wife to drive a safe distance behind the auto transport and to watch the straps because he “was concerned they were going to come off.” Mrs. Erazo testified that she drove about three car lengths behind her husband “because he was more worried about me than anything.” Mr. Erazo testified he was worried the truck would come off the auto transport and that his wife’s vehicle would hit the truck.
Mrs. Erazo testified that she was driving about forty-five miles per hour on Interstate 10 in eastern New Orleans when a black truck passed her in the next lane and attempted to cut in front of her, just as the Ford F-150 her husband was towing suddenly came loose from the auto transport. The black truck crashed into the Ford F-150.
Mr. Gaunt, who was driving the black truck, testified that he was travelling in the left lane with his cruise control set at seventy miles per hour, and that Mr. Era-zo’s van was in the center lane with Mrs. Erazo driving behind him. Mr. Gaunt 1¶ .¡stated that as soon as he had passed Mrs. Erazo’s vehicle, he saw the auto transport hit a bump, bounce, and the wheels of the Ford truck come off the back of the auto transport. He also saw the left tire strap “completely straighten off and fly back.” Mr. Gaunt testified that the truck had appeared to be properly strapped down when he first looked at it, just before the strap came undone. At that point, the Ford truck came loose and went left into his lane. He swerved and hit his brakes, but he could not avoid hitting the truck.
Other evidence on the issue of liability included the testimony of Mr. Azhar Khan, *1262 the owner of the Citgo and of the U-Haul dealership operated at that location. Mr. Khan testified that the U-Haul portion of his business was small compared to the revenue he made from the convenience store and gas station. He stated that he did not keep a regular stock of U-Haul equipment, but U-Haul would deliver for pickup whatever equipment a particular customer had ordered, and the Citgo also served as a drop off point for equipment being returned by customers. When Mr. Khan purchased the Citgo, there had been a U-Haul dealership operated at that location. In 2004, he applied for a U-Haul dealership because he was getting constant phone calls from people seeking to rent U-Haul equipment. After he became a dealer, Mr. Khan received approximately two day’s training from Gerald Dempsey of U-Haul, after which Mr. Dempsey continued to check up on Mr. Khan’s procedures for about two months. Mr. Khan stored the larger U-Haul equipment in an unsecured lot behind the convenience store. When a customer had a telephone reservation, as did Mr. Erazo, Mr. Khan would ask the customer to repeat the information he had already given the U-Haul telephone operator. The customer then had to sign the contract. Mr. Khan would then give the customer a hscopy of the contract and the U-Haul brochures that contained the instructions on how to operate the particular items of equipment the customer had rented.
Mr. Khan testified that he always relied on the information given by the customer, and that he was not expected to actually look at the customer’s vehicle or at any vehicle the customer intended to tow. He stated that he did not actually go outside to look at Mr. Erazo’s truck, but that even if he had seen it, he would not have been able to tell what model it was or what features it had. Mr. Khan stated that he did not know what type of vehicles could be towed on an auto transport; he relied upon the information provided by the customer, and once that information was entered into the computer, the system automatically determined whether the vehicle could be towed in that manner. Mr. Khan also testified that he did not know how to load a vehicle onto a U-Haul auto transport. He was unable to correctly state how many straps and/or chains are on a U-Haul auto transport. Mr. Khan testified that he did not just assume U-Haul had supplied him with a properly equipped auto transport; he inspected it, as that was part of his job.[10] He further testified that each piece of U-Haul equipment he received should have been accompanied by an “R & D” tag, which the previous dealer would have been required to fill out upon inspecting the equipment, and each dealer is required to keep his copies of these tags for three years. Nevertheless, according to Mr. Khan, he was unable to locate the R & D tag for the auto transport he rented to Mr. Erazo. Mr. Khan identified a U-Haul document showing the rental history of the auto transport in question, identified as AT1115G. He confirmed that the auto transport had been sent to him directly from another U-Haul location where it had been | ^dropped off by a prior rental customer, and noted that the dealer at that location should have filled out an R & D tag that would have accompanied the auto transport when it was delivered to Mr. Khan. After Mr. Khan had inspected the *1263 equipment and filled out the R & D tag, he would have given a copy to the next renter, Mr. Erazo. Mr. Khan denied that Mr. Erazo came back to the Citgo after having loaded his truck onto the auto transport and questioned Mr. Khan as to whether the truck fit properly. This testimony by Mr. Khan on this point directly conflicts with that of Mr. and Mrs. Erazo.
Mr. William Burton, owner of a U-Haul Center on Veterans Highway in Kenner, identified a “one-way-in” document placed in evidence. The document reflected that the auto transport Mr. Erazo rented was dropped off on December 31, 2005, at Mr. Burton’s facility. Mr. Burton did not specifically remember Mr. Erazo. Mr. Burton confirmed that his business had tripled at that time in the aftermath of Hurricane Katrina. He stated that he should have filled out an R & D tag on the auto transport, but did not remember whether or not he had done so. He stated he had searched for the R & D tag but had never found it. However, he did inspect the auto transport after it had been turned in and saw no damage — no chains missing or straps broken. He stated that if there had been anything broken, he would have repaired it. He performed no repairs on this particular auto transport. He testified that the transport was picked up from his facility by an outside vendor, Pumpkin Tire Center.
Mr. Gary Smith, owner of Pumpkin Tire Center, also a U-Haul dealership, testified by video deposition. He identified a document showing that the auto transport in question was transferred from Mr. Burton’s facility to Pumpkin Tire Center on January 4, 2006. Mr. Smith explained that he had been performing | iscertain types of repairs (everything except motors, transmissions, body work and glass) for U-Haul at his facility for about 6-8 years. He was paid by the hour, and U-Haul had established a set amount of time for each specific type of repair upon which payment would be based. In the aftermath of Hurricane Katrina, Mr. Smith was also storing excess U-Haul equipment at his facility, which had more space than most, because of the increased business in the New Orleans area.
Mr. Smith stated that he inspected auto tow AT1115G when it got to his facility, and he replaced a safety chain on the tongue and the wiring harness for that chain. He explained that a U-Haul auto transport has 5 chains in all: 3 “safety” chains on the tongue that attach to the towing vehicle, and 2 “security” chains, one that should be attached to the front axle of the towed vehicle and one that should be attached to the back axle, which are designed to hold the towed vehicle on the transport if the tire straps fail. All the chains used by U-Haul on its auto tows were exactly the same in size and appearance. Mr. Smith had a special gauge to test the strength of the chain links; the chain he replaced on AT1115G was worn from having been dragged on concrete. Mr. Smith stated that he did not have an invoice showing the repair because he would have been paid such a small amount — $4.00—that he did not think it was worthwhile to write up the repair.
At some point later, Mr. Smith got a phone call from Pam Allen of U-Haul, who asked if he had ended up with AT1115G, which had been involved in an incident. When he responded that he had it, he was asked to inspect that particular auto transport again. He did so, and found that all of the chains, ratchets, and tire straps were intact and in good shape. Mr. Smith noted that he had never known a tire strap *1264 to come loose unless it had been improperly attached. Mr. Smith further 119testifíed that he kept his R & D tags for three years, but was not asked to look for this particular one within the three-year time period.
Mr. Gerald Dempsey, a field manager for U-Haul of Georgia, testified that his job included the training of U-Haul’s independent dealers, and that he had trained Mr. Khan. He stated that Mr. Khan’s training consisted of one and one-half days formal instruction plus follow-up assistance for several weeks. Mr. Khan was also provided with a Dealer Operations Manual and a telephone number he could call anytime he did not know something, as the dealers were not supposed to make judgment calls. Mr. Dempsey testified that a dealer such as Mr. Khan should be familiar enough with the U-Haul equipment to inspect it. He stated that the dealer is provided with a checklist to use in inspecting each different type of equipment; the checklist contains, for example, the number of chains and/or straps the equipment should have. Mr. Dempsey confirmed that Mr. Khan had a duty to inspect the auto transport when he received it and to fill out the R & D tag, which should have been retained for 3 years. He also stated that Mr. Khan had no responsibility to look at the vehicle to be towed or to insure that it was suitable to be towed on an auto transport, and that Mr. Khan’s only responsibility in that regard was to ask the customer to confirm the information he had given at the time he had made the reservation, just in case the information had changed. Mr. Dempsey testified that U-Haul had no complaints about Mr. Khan as a dealer.
Mr. Dempsey confirmed, as documented by a corporate-wide memo dated May 19, 2006 and introduced into evidence, that U-Haul had been unable to locate any of the R & D tags for the AT1115G, which tags presumably would have shown the condition of the auto transport both at the time Mr. Erazo picked it up and at the time he turned it back in. According to Mr. Dempsey, when Mr. Erazo |2nrented the auto transport, he should have been given a U-Haul folder containing a copy of the rental contract, a green or yellow validation tag, also called the R & D tag, and a user guide for each piece of equipment or vehicle he rented.
Ms. Rachel Reed, a program manager for U-Haul, testified that she was the person responsible for training all of U-Haul’s telephone reservations agents in 2005. Ms. Reed stated that each agent goes through a two-week training period. The first week concludes with a test on which the agent must score at least eighty percent (80%); the second week consists of supervised phone calls. Ms. Reed related the procedure to be followed by an agent speaking with a customer who is seeking to rent an auto tow. The customer is first asked for the year, make and model of the vehicle to be towed. In the case of a Ford F-150, the next question would be whether the truck had a regular or a super cab. If the customer answers “I don’t know” to that question, as Mr. Erazo testified he did, the next question should be “Is there a back seat?” If the truck has a back seat, the reservationist is supposed to enter “super cab” into the computer program; if it does not have a back seat, the reservationist enters “regular cab.” This distinction is significant because a Ford F-150 with a regular crew cab is recommended for towing on a U-Haul auto transport, whereas a Ford F-150 with a super cab is not. Ms. Reed testified that this question would be asked and the correct result reached ninety-nine percent of the time. Ms. Reed *1265 confirmed that had the reservationist obtained and entered the correct information for Mr. Erazo’s truck, the computer would have indicated that the truck was not recommended for towing on an auto transport because the truck’s wheelbase and weight exceeded the recommended máximums. Ms. Reed testified that in 2005 the telephone reservations agents were paid $7.00 per hour and had a quota of 1.9 reservations per hour; in addition, an agent was paid an additional |⅞1 amount per each reservation that exceeded that quota. She stated that in December of 2005, the agents were averaging 3.25 reservations per hour. She further testified that during U-Haul’s busiest periods, such as the summer and holiday months, the company hired additional reservations agents that were part-time or temporary employees. Finally, Ms. Reed testified that she was not able to determine which reservations agent had made Mr. Erazo’s reservation.
The final witness on the issue of liability was Mr. James Fait, who testified as the representative of U-Haul International. Mr. Fait stated he was an engineer who had worked for U-Haul for more than thirty years. He testified that U-Haul is a “do-it-yourself’ company that provides customers with the facilities and equipment they need to move themselves at less than half the cost of hiring professional movers. Mr. Fait stated that U-Haul has a duty to analyze the customer’s situation, make a recommendation as to what equipment is needed, and provide the customer with safe equipment. U-Haul’s ability to perform this duty depends upon its customers being honest and accurate in providing their information. Therefore, the customer is asked to provide his information twice during the rental process, once by telephone and again when the customer is at the counter. The customer has a third opportunity to correct inaccurate information when he signs the rental contract. Once the customer’s information is entered into the computer, the computer determines what combinations of towing vehicle, transport and towed vehicle are recommended.
Mr. Fait stated that U-Haul has approximately 15,000 centers and dealerships, all of which use the same computer system for purposes of consistency. One of the reasons U-Haul employs such a system is so that it does not have to depend upon the judgment of individual agents. Mr. Fait testified that 122⅛ is not U-Haul’s policy to have its dealers physically inspect the customer’s vehicle or to verify that it matches the description the customer has given to the agent; in fact, the vehicle the customer intends to tow is often not present when the customer picks up the towing equipment.
Mr. Fait identified the U-Haul User’s Manual that would have been provided to Mr. Erazo in December of 2005 when he rented the auto transport. He noted that the manual provides the maximum vehicle weight that is recommended for towing aboard the transport, as well as a toll-free hotline number for customers to call if they have any questions or problems. Mr. Fait testified that in addition, an auto transport in 2005 had approximately twenty decals on it specifying the FMVSS safety standards and instructions on how to load and unload the transport. He testified that to attach a vehicle to the transport, the customer must place a strap around each tire and secure it with a ratchet. Mr. Fait stated that the strength specification for each strap is 9,000 pounds, and that Mr. Erazo’s truck weighed 4,425 pounds. Mr. Fait stated that in addition to the straps, which secure the vehicle, *1266 each transport has two security chains that should be attached to the vehicle, one in the front and one in the back; the chains hold the vehicle if the straps for some reason come loose. He stated that the breaking strength of each security chain is 7,000 pounds. Mr. Fait testified that according to its actual specifications, the auto transport in question is capable of towing a 4,700 pound vehicle, but U-Haul’s recommendation, which is incorporated into its computer system, limits the weight of the towed vehicle to 4,000 pounds. Mr. Fait explained that U-Haul’s recommendations are deliberately conservative to ensure customer satisfaction, because if a vehicle’s fit appears to be a tight squeeze, the customer will not be happy with the way it looks, even though the tow may be safe.
|aMr. Fait was questioned as to why U-Haul does not use a technology that would allow its reservations agents to input a vehicle’s VIN number into the computer. He responded that the customer usually does not know the VIN number; the VIN number is difficult to input accurately because of its length; and once entered, the VIN number would indicate the make and model of the vehicle but still would not provide the information U-Haul needs regarding the vehicle’s specifications, such as its weight and the length of its wheelbase. With respect to the particular auto transport involved in this case, Mr. Fait testified that U-Haul had no record of any straps being broken, any chains missing, or of any repair being made to this transport following the accident.
Mr. Fait also testified concerning the telephone call Mr. Erazo made to U-Haul’s toll-free hotline after he had stopped in Mississippi. He stated that the job of the U-Haul telephone operator is to assess the problem and give directions to the customer based upon the customer’s answers to the operator’s questions. Mr. Fait testified that as he understood it, Mr. Erazo told the operator that his truck had slipped back on the transport but that he had been able to move the truck forward and re-strap it. According to Mr. Fait, the operator asked Mr. Erazo whether he could re-secure the truck, but did not specifically ask him whether he believed it was safe to proceed. Mr. Fait testified that if the customer had indicated that he did not feel it was safe to proceed, the U-Haul operator would have instructed the customer to stay where he was, and a U-Haul representative would have been sent to that location to investigate the problem. Because Mr. Erazo did not so indicate, the U-Haul operator told him to drive to the nearest U-Haul center.
Based upon the totality of the evidence, the trial court found Mr. Erazo to be ten percent at fault because he decided to continue to tow the auto transport at 124highway speeds even after the truck on it had slipped, despite his obvious concern about the safety of the situation. The trial court in its written reasons stated that Mr. Erazo was a credible witness, and that “a reasonable person would not want to drive thirty miles out of their way to let U-Haul examine the auto transport.”
The trial court assessed the remaining ninety percent of the fault to the U-Haul defendants. It assessed ten percent to Mr. Khan, noting that he was not a credible witness and routinely contradicted his deposition testimony at trial. Because Mr. Khan did not know how to load an auto transport and gave inconsistent answers as to how many chains and straps a transport should have, the trial court judge indicated she did not believe that Mr. Khan could have performed an adequate inspection of *1267 the transport. Because of what she believed to be Mr. Khan’s shortcomings as a dealer, the trial court judge assessed ten percent of the fault to U-Haul of Georgia for its failure to adequately train Mr. Khan. Finally, the trial court assessed seventy percent of the fault to U-Haul International based primarily upon two acts of negligence: the telephone reservations agent’s failure to enter the proper type of truck into the system, and the U-Haul hotline operator’s instructing Mr. Er-azo to drive to the nearest U-Haul Center rather than to wait for U-Haul to send help. Regarding the first error, the trial court indicated in its reasons that U-Haul was negligent for failing to use software that identifies a vehicle by its VIN number. The trial court judge noted that U-Haul’s reliance upon the customer to provide accurate information was negligent because “(a) customer can be honest without being knowledgeable” and therefore end up with unsuitable equipment. Regarding U-Haul’s second error, the trial court reasoned that the instruction to Mr. Erazo to drive to the nearest U-Haul facility eliminated U/any possible intervening cause” of the accident, which the court believed would have been prevented if U-Haul had sent a tow truck instead.
On appeal, the U-Haul defendants argue that the trial court committed manifest error by failing to find that Mr. Erazo was solely at fault for the accident. They stress that Mr. Erazo was given and pled guilty to a traffic citation, admitted into evidence, for violating Orleans Parish Ordinance Sec.-154-315 relative to the loading of vehicles. The appellants further contend the plaintiffs failed to prove that any breach of duty by U-Haul was a legal cause of the accident. They assert that any defect in the U-Haul telephone reservations system, which they deny was proved, or any negligence of the reservations agent in entering the wrong type of truck, is irrelevant because there was no evidence indicating that the size or weight of Mr. Erazo’s truck caused or contributed to the accident. They further argue that the auto transport itself was not shown to be defective in any way. Finally, they argue that Mr. Erazo could have prevented the accident by driving thirty miles to the U-Haul facility as he was instructed to do or by telling the telephone operator that he did not believe it was safe to proceed at all. Instead, Mr. Erazo hung up on the conversation and then, in his own words, “blew off’ the instruction, despite his obvious concern for his wife’s safety.
Conversely, the plaintiffs assert that the trial court’s allocation of fault is reasonable based upon the evidence. We agree that the trial court’s assessment of ten percent fault to Mr. Kahn was not manifestly erroneous. Mr. Khan testified that he inspected the auto transport before renting it to Mr. Erazo. This testimony was uncontro-verted, but given the multiple inconsistencies in Mr. Khan’s testimony, we cannot say it was unreasonable for the trial court to conclude that Mr. Khan lacked credibility. Moreover, Mr. Khan’s testimony confirmed that|2r,even if he inspected the auto transport, he did not necessarily know what to look for. However, in the absence of any evidence that the auto transport was defective, we cannot say that Mr. Khan’s failure to inspect it contributed to the accident. Nevertheless, we find the ten percent assessment of fault to Mr. Khan to be reasonable in light of Mr. and Mrs. Erazo’s testimony that Mr. Erazo drove back to the Citgo with his truck loaded onto the auto transport because he was concerned the truck did not fit properly. Although Mr. Khan denied that Mr. *1268 Erazo ever returned to the Citgo, the trial court determined that Mr. Erazo was more believable. Mr. Erazo, whom the trial court specifically found to be a credible witness, testified that when he asked Mr. Khan to go outside and look at the truck, Mr. Khan responded that U-Haul would not have rented the auto transport to Mr. Erazo if it had not been suitable for towing his truck. This giving of false assurance by Mr. Khan, instead of his doing something further to investigate the customer’s concern, merits the assessment of ten percent fault. If Mr. Khan had called U-Haul to report the issue at that time, it probably would have been discovered that the truck was not recommended for towing on the auto transport, which might have prevented the accident.
We find no reasonable basis for the trial court’s assessment of ten percent fault to U-Haul of Georgia, however. The trial court based this assessment on the assumption that Mr. Khan was such an incompetent U-Haul dealer that he must have been inadequately trained. Nevertheless, there was no evidence indicating that U-Haul of Georgia breached its duty to properly train its dealers in general or Mr. Khan in particular. Mr. Dempsey’s testimony concerning U-Haul’s training process and his training of Mr. Khan was not called into question. He testified that U-Haul had no complaints about Mr. Khan as a dealer. Although we conclude that 127Mr. Khan’s failure to investigate Mr. Erazo’s concern was negligent, there was no evidence suggesting that his negligence was attributable to inadequate training.
Additionally, we find the trial court’s assessment of seventy percent fault to U-Haul International to be unreasonable in view of the lack of direct evidence that any single act of negligence caused the accident in question. The testimony of U-Haul’s own witnesses unequivocally showed that the U-Haul telephone reservations agent was negligent in failing to ask the proper questions of Mr. Erazo, which resulted in him attempting to use an auto transport that was not recommended for towing a truck as large as his Ford F-150. Nevertheless, the evidence also showed that the auto transport was actually capable of towing a truck of that weight and length, making it unlikely that the size of the truck alone caused it to come off the transport. Similarly, there was no showing that U-Haul’s decision not to use a VIN number system contributed to this accident.
The trial court’s written reasons reflect that the assessment of fault to U-Haul was primarily based upon the U-Haul operator’s instruction to Mr. Erazo that he should drive approximately thirty miles to the nearest U-Haul center instead of instructing him to stay put while U-Haul dispatched a tow truck. However, we do not find that instruction to be an unreasonable response to the information that was provided to the U-Haul operator by Mr. Erazo. Mr. Erazo never told the operator he believed it was not safe for him to continue towing the auto transport. He called to communicate his concern because the truck appeared to have slipped. When he was asked if he would be able to re-secure the truck with the straps, he responded that he had already done so. Then, when the operator suggested that he drive north to the nearest U-Haul center, he did not respond to her suggestion; he merely hung up and ignored it. According to the testimony of Mr. Fait, if Mr. Erazo had 1 ^responded that he did not feel it was safe for him to continue driving on the highway, U-Haul would have sent help. *1269 Instead, Mr. Erazo decided to continue on his way despite the fact that he was concerned enough to drive forty-five miles per hour on the interstate with his emergency flashers on and to instruct his wife to maintain a safe distance behind him.
In view of the evidence, we find it unreasonable for the trial court to have assigned seventy percent of the fault to U-Haul International based primarily upon U-Haul’s failure to send a tow truck. U-Haul’s course of conduct was based upon what Mr. Erazo told its phone operator. This course of conduct was not unreasonable in light of the limited information U-Haul possessed. By contrast, Mr. Erazo was the one with firsthand knowledge of the situation. Mr. Erazo obviously was aware of the potential danger posed by his decision to continue on his route because he expressed concern about his wife’s safety. However, he did not effectively communicate this concern to U-Haul. Instead, he decided to take the risk of the truck coming loose from the transport rather than inconvenience himself by prolonging his trip. Moreover, there was no evidence to contradict Mr. Gaunt’s testimony that he saw the left tire strap come undone and fly up just before Mr. Erazo’s truck came off the transport. In the absence of any evidence that the strap was defective, the only reasonable inference from the evidence is that the strap’s coming loose was at least partly due to a failure on the part of Mr. Erazo to secure it properly. Based on this record, no reasonable fact finder could conclude that the negligence of U-Haul was primarily responsible for causing this accident. Under the circumstances, we find that the highest percentage of fault reasonably within the trial court’s discretion to assign to U-Haul International was forty percent.
|2aIn our view, the most reasonable conclusion stemming from the evidence is that Mr. Erazo was primarily at fault in causing this accident, and the only reasonable conclusion is that Mr. Erazo’s fault was at least equal to that of the U-Haul defendants. Mr. Erazo did not know pertinent information about his own truck when asked by the U-Haul reservationist. He did not bother to find out whether his truck had a regular or a super cab, even though when he went to pick up the auto transport, he had an opportunity to supplement and/or correct the information he had initially provided to U-Haul. He testified that he did not read the manuals given him with the directions as to how to attach his truck to the transport, although he was the only one responsible for doing so. Once he had attached the truck, he was concerned that it did not fit properly. Despite this concern, he got on the road with the truck in tow. Most significantly, when the truck began to slip off the auto tow, Mr. Erazo knew there was a problem. Nevertheless, he decided to re-strap the truck down (presumably the same way he had the first time) and continue on his way, even though he was obviously worried the truck would come loose on the highway, which caused him to drive forty-five miles per hour with his emergency flashers on and tell his wife to keep a safe distance behind him. Despite these measures, when Mr. Erazo encountered a bump in the highway, exactly what he feared would happen actually occurred — the truck came off the auto tow and injured someone else. According to the record, Mr. Erazo was issued and pled guilty to a traffic citation for failing to properly secure his load. Under these circumstances, we conclude that the lowest amount of fault that was reasonably within the trial court’s discretion to assign to Mr. Erazo was fifty percent.
13fAccordingly, we find that the trial court’s allocation of fault was manifestly *1270 erroneous in view of the totality of the evidence. Based on the record, we reallocate fault as follows:
U-Haul International, Inc. — 40%;
Azhar Khan d/b/a Citgo Snack and Pack — 10%; and
Mr. Erazo — 50%.
III. Quantum of Damages Awarded to Mr. Gaunt
The U-Haul defendants contend that the trial court abused its discretion by awarding an excessive amount of general damages to Mr. Gaunt, and by awarding him future medical expenses without sufficient evidentiary support.
There is no question that the abuse of discretion standard of review applies when an appellate court examines a factfinder’s award of general damages. Wainwright v. Fontenot, 2000-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. As the Louisiana Supreme Court has stated:
The assessment of “quantum,” or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, “the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.” Youn v. Mantime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). Moreover, before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Coco v. Winston Indus., Inc., 341 So.2d 332, 334 (La.1977) (internal citations omitted).
Id., p. 6, 774 So.2d at 74.
The trial court awarded Mr. Gaunt $1,125,000.00 in general damages, which included pain and suffering ($875,000.00), mental anguish ($150,000.00), Impermanent disability ($25,000.00), loss of enjoyment of life ($50,000.00), and scarring ($25,000.00). In its written reasons, the trial court referred to Mr. Gaunt as an “eggshell plaintiff’ because of his pre-existing medical conditions. As noted by the appellants in their brief, prior to this accident Mr. Gaunt had undergone surgeries on both knees, had breathing issues from exposure to toxic mold, and was being treated for multiple chronic conditions including asthma, hypertension, hyperlipidemia, depression and elevated blood sugar. The trial court found that all of Mr. Gaunt’s post-accident surgeries, except for those procedures done on his knees, were causally related to the December, 2005 accident. On appeal the U-Haul defendants argue that Mr. Gaunt’s post-accident surgeries were caused by degenerative changes to his joints and spine rather than by injuries received in this accident. The record does not support appellants’ argument, however.
Following the accident, Mr. Gaunt experienced back, neck and shoulder pain which necessitated several surgeries, including a left shoulder arthroscopy; a three level decompression and fusion of multiple herniated discs in his lumbar spine, which surgery lasted eight hours and required the use of eight screws, two *1271 rods and a bone growth generator that had to be removed in a subsequent surgery; and a four level cervical fusion and discec-tomy that utilized metal plating, ten screws and bone taken from his hip. Mr. Gaunt’s treating orthopedists, Dr. Voor-hies and Dr. Hoffmann, testified that these surgeries were necessary to repair injuries Mr. Gaunt had received in the December, 2005 accident. The defendant’s expert, Dr. Steiner, did not dispute that these surgeries were medically necessary. Moreover, although Dr. Steiner testified that Mr. Gaunt’s herniated discs were, in his opinion, the result of degenerative changes, he nevertheless agreed that, based upon Mr. Gaunt’s medical history, the December, 2005 accident had aggravated his preexisting [ S2conditions. Dr. Steiner testified that when a plaintiff has such degenerative conditions prior to undergoing a trauma, a physician must rely upon the patient to say how much his pain has been aggravated by the trauma. Considering the evidence, we do not find the trial court’s determination that Mr. Gaunt’s surgeries resulted from the accident to be unreasonable.
Moreover, the evidence unequivocally demonstrates that Mr. Gaunt’s lifestyle was severely impacted by this accident. Mr. Gaunt testified that he owned and operated a sign business, supplying primarily real estate signs. Mr. Gaunt testified that prior to the accident, he worked approximately sixty hours per week and was able to lift and carry heavy items, such as large signs, generators, refrigerators and freezers. Since the accident however, Mr. Gaunt has been able to do only desk work for approximately twenty-five hours per week; he can no longer lift anything heavy, stand for long periods of time, or walk long distances. This testimony was corroborated by Mr. Gaunt’s son, Darren, who worked in the business with his father, and by Mr. Gaunt’s employee, Richard Niemi. Prior to the accident, Mr. Gaunt enjoyed cooking for large groups of people, deep-sea fishing, and carpentry, but can no longer participate in these activities. Mr. Gaunt’s wife testified that his pain had negatively affected their sex life, as well as her husband’s ability to shop, cook, dance, bike and walk for exercise, help with housework and travel with her. Mr. Gaunt’s physician has assigned him a 27% permanent disability and limited him to lifting items weighing twenty pounds or less. In addition, Mr. Gaunt has a permanent scar on his chin resulting from his being positioned face down for eight hours during his spine surgery.
It is well settled that, according to Louisiana law, a defendant “takes his victim as he finds him and is responsible for all natural and probable Inconsequences” of his negligent conduct. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). Thus, when the defendant’s tortious conduct aggravates a preexisting condition, the defendant must compensate the victim for the full extent of the aggravation. Id. at 1006. This concept is often referred to as the “eggshell” plaintiff principle. See Chavers v. Travis, 2004-0992, p. 8 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 394; Logan v. Brink’s, Inc., 2009-0001, p. 9 (La.App. 4 Cir. 7/1/09), 16 So.3d 530, 538. Pursuant to this principle, the plaintiff must establish a causal link between the tortious conduct and the aggravation of his preexisting medical condition. Logan, p. 10, 16 So.3d at 539 (citing Chavers, p. 9, 902 So.2d at 394.) In its written reasons, the trial court cited Logan v. Brink’s, Inc., supra, in support of its award of general damages. In Logan, this Court affirmed the trial court’s award of $865,000.00 in *1272 general damages to an “eggshell” plaintiff[11] who underwent two spinal surgeries — a triple fusion disc replacement and a subsequent surgery to treat a bone infection acquired at the site of the fusion— following an automobile accident for which he was found to be fifteen percent at fault.
Considering the record, we do not find that the trial court abused its great discretion in determining the amount of general damages awarded to Mr. Gaunt. Mr. Gaunt had three surgeries (shoulder, lumbar spine and cervical spine), incurred a permanent partial disability and a permanent disfigurement, and continues to have pain and physical restrictions that have significantly altered his lifestyle. We therefore decline to disturb the trial court’s award of general damages.
The U-Haul defendants also argue that the trial court committed manifest error by awarding $100,000.00 in future medical expenses without sufficient | ^evidentiary support. The proper standard for the trial court’s determination of whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expenses will be medically necessary. Moody v. Cummings, 2009-1233, p. 15 (La.App. 4 Cir. 4/14/10), 37 So.3d 1054, 1064 (citing Hoskin v. Plaquemines Parish Government, 97-0061, p. 6 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, 211). In Molony v. USAA Prop. & Cas. Ins. Co., 97-1836 (La.App. 4 Cir. 3/4/98), 708 So.2d 1220, this Court articulated that standard as follows:
Future medicals need not be established with mathematical certainty although a plaintiff must prove that it is more probable than not that expenses will be incurred. Although a plaintiff is not required to prove the exact value of the necessary expenses, some evidence to support the award must be contained in the record. If the fact finder can determine from past medical expenses or other evidence a minimal amount that reasonable minds could agree upon, then an award is proper.
Id., pp. 2-3, 708 So.2d at 1221-22 (citations omitted). Moreover, in Dunomes v. Plaquemines Parish Government, 2009-0570 (La.App. 4 Cir. 10/21/09), 24 So.3d 242, we stated that “when the need for future medical care is established, but the cost is not, the factfinder may make a reasonable award.” Id., p. 3, 24 So.3d at 245 (quoting Lacy v. ABC Ins. Co., 97-1182, p. 13 (La.App. 4 Cir. 4/1/98), 712 So.2d 189, 196).
In the instant case, Dr. Voorhies testified that it is more probable than not that Mr. Gaunt will need additional surgical fusion of his lumbar spine at the L2-L3/ L4-L5 level. The plaintiffs introduced exhibits showing that the cost of Mr. Gaunt’s 2007 lumbar fusion was approximately $285,000.00, and the cost of his 2009 cervical fusion was approximately $147,000.00. Considering this evidence, we cannot say it was unreasonable or manifestly erroneous for the trial court to |3fihave awarded Mr. Gaunt $100,000.00 in future medical expenses. We therefore decline to disturb that award.
IY. Quantum of Damages Awarded to Mrs. Gaunt
In their answer to the appeal, the plaintiffs contend the trial court abused its *1273 discretion by awarding an insufficient amount of damages to Mrs. Gaunt for loss of consortium. The trial court awarded Mrs. Gaunt $86,000.00. In its written reasons the court noted that certain activities Mr. Gaunt formerly enjoyed with his wife, such as dancing, cooking for large groups, and sexual intimacy, would normally diminish with age but had been more severely curtailed by this accident.
Citing awards in prior cases,[12] the plaintiffs contend that the lowest amount that was reasonably within the trial court’s discretion to award was $100,000.00. Conversely, the U-Haul defendants contend Mrs. Gaunt’s award exceeds the majority of loss of consortium awards made to spouses of plaintiffs who suffered cervical and/or lumbar injuries.[13]
Based on the record, we cannot say the trial court abused its discretion by awarding Mrs. Gaunt $36,000.00. Mrs. Gaunt testified that since the accident, her husband’s ability to engage with her in certain activities, such as staying up late, walking for exercise, cooking, dancing, and having sex, has been limited but not completely absent. Under the circumstances, we find that $86,000.00 does not fall below the minimum award that is reasonably within the discretion of the trial court to make. We therefore decline to disturb that award.
CONCLUSION
| .^^Accordingly, for the reasons stated, we conclude that the trial court committed manifest error in its allocation of fault among the defendants. We therefore reverse the allocation of fault. We find that the defendants are liable to the plaintiffs in the following percentages:
Omar Erazo is liable for 50% of the fault;
Azhar Khan d/b/a Citgo Snack and Pack is liable for 10% of the fault; and U-Haul International, Inc. is liable for 40% of the fault.
In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART AND REVERSED IN PART
McKAY, J., concurs in the result.

. The parties stipulated to this fact at trial. However, the conversation between U-Haul telephone reservations agent and Mr. Erazo that resulted in his rental of this auto transport was the subject of conflicting testimony, as is discussed infra.

. There is conflicting evidence as to what occurred next. Mr. and Mrs. Erazo both testified that Mr. Erazo did not think the truck looked right after he had hooked it up to the transport because the fit seemed too tight, so he drove it back to Mr. Khan’s store to ask him about it. According to their testimony, Mr. Khan responded to Mr. Erazo’s inquiry by remarking that U-Haul would not have rented the equipment to them if it had not been right for their needs. Mr. Khan, however, denied having made any such statement and denied that Mr. Erazo had ever come back to his store after having left the first time with his equipment. See our discussion of the evidence, infra.

.The plaintiffs originally sued Progressive, Republic Western Insurance Company, CIT-GO Snack and Pack, Omar Erazo, and U-Haul International Inc. By means of a First Supplemental and Amending Petition, the plaintiffs added "U-Haul Co., of Northern Georgia” as a party defendant and substituted "Azhar M. Khan, d/b/a CITGO Snack and *1255 Pack” in place of "CITGO Snack and Pack.” In answer to that petition, defendants asserted that "U-Haul Co. of Georgia” was the proper name of the party the plaintiffs had designated as “U-Haul Co., of Northern Georgia”.

. The trial transcript does not contain any comments by the judge's clerk. It does contain a notation that an "Informal discussion off the record” occurred at one point during this exchange. The U-Haul defendants’ assertion that part of the discussion among the judge, her clerk, and the parties' attorneys was improperly redacted from the trial transcript was the subject of U-Haul's "Motion to Correct Trial Transcript and to Designate Additional Portion of Trial Record and to Produce a Copy of Trial Audio Recordings with Request for Expedited Hearing” filed in the trial court subsequent to the rendering of judgment; that motion was denied with written reasons on May 15, 2011. A virtually identical "Motion to Correct Trial Transcript and to Designate Additional Portion of Trial Record” was filed by U-Haul in this Court on August 24, 2011, and was denied on February 2, 2012.

. On appeal, the U-Haul defendants cite as the basis for this motion La. C.E. art. 403, which provides:
*1257 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

. Canon 3(A)(6) provides, in pertinent part: "Except as permitted by law, a judge shall not permit private or ex parte interviews, arguments or communications designed to influence his or her judicial action in any case, either civil or criminal.... A judge shall not knowingly accept in any case briefs, documents, or written communications intended or calculated to influence his or her action unless the contents are promptly made known to all parties....”

. In Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735, the Supreme Court stated:
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. See Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. See Lasha, 625 So.2d at 1006. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pre-termit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Lasha, 625 So.2d at 1006.

. We do not address the propriety of the trial court’s performance of an internet search, which issue is not presented in the instant case.

. Mr. Erazo testified that he did not recall the transport having a second chain to attach to the back axle, but this testimony was contradicted by the testimony of his wife, who said she saw her husband wrap chains around both the front and back axles. In addition, Mr. Burton, the owner of the U-Haul Center in Kenner where Mr. Erazo turned in the transport, and Gary Smith, who performed repair service for U-Haul on the transport after it was turned in, testified that it was not missing any chains or straps.

. Mr. Khan's testimony was impeached by his prior deposition testimony that he had not inspected the auto transport because he assumed U-Haul checked out everything before sending it to him.

. Mr. Logan had undergone a two-level lumbar fusion surgery about ten years before the accident in question.

. The plaintiffs cite Crane v. LaRocca, 2005-0283, p. 11 (La.App. 4 Cir. 1/18/06), 924 So.2d 1023, 1030 ($200,000.00 loss of consortium award), and Joseph v. Entergy, 2000-2213, pp. 10-13 (La.App. 4 Cir. 2/13/02), 811 So.2d 54, 61-63 ($142,000.00 loss of consortium award found to be not an abuse of discretion, but reversed on the basis of prescription).

. The defendants cite Bouquet v. Wal-Mart Stores, Inc., 979 So.2d 456 (La.2008) ($15,000.00 loss of consortium award), and Johnson v. Murphy Exploration & Prod. Co., 980 So.2d 745 (La.App. 4 Cir.2008) ($25,000.00 loss of consortium award).