FINAL

LOUIS RIDGEL

VERSUS

MITCHELL CHEVALIER, ST.
BERNARD PARISH FIRE
DEPARTMENT THROUGH
THE ST. BERNARD PARISH
GOVERNMENT, AND
LEXINGTON INSURANCE
COMPANY

\*     NO. 2019-CA-0250

\*

\*     COURT OF APPEAL

\*

\*     FOURTH CIRCUIT

\*     STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 119-826, DIVISION "C"
Honorable Kim C. Jones, Judge Presiding
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*

(Court composed of Judge Roland L. Belsome, Judge Regina Bartholomew-Woods, Judge Dale N. Atkins)

John J. Finckbeiner, Jr.
LAW OFFICE OF JOHN FINCKBEINER, JR.
2203 Pakenham Drive
Chalmette, LA 70043

      COUNSEL FOR PLAINTIFF/APPELLEE

Perry M. Nicosia
District Attorney
David C. Jarrell
OFFICE OF THE DISTRICT ATTORNEY FOR THE PARISH OF ST.
BERNARD
1101 W. St. Bernard Highway
Chalmette, LA 70043

      COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**
**JANUARY 8, 2019**

This is a personal injury case. Appellant, Mitchell Chevalier ("Mr. Chevalier"), appeals the trial court's October 30, 2018 judgment finding Mr. Chevalier and the St. Bernard Fire Department ("SBFD"), through the St. Bernard Parish Government, (hereinafter collectively referred to as "Appellants"), liable, *in solido*, for an automobile accident that occurred between them and Appellee, Louis Ridgel ("Mr. Ridgel"), and awarding Mr. Ridgel a total of $143,074.00 in damages, which included $20,523.00 in medical special damages; $2,551.00 in property damages; and $120,000.00 in general damages. Appellants appeal this judgment.

For reasons that follow, we affirm.

## BACKGROUND

On October 29, 2011, Mr. Ridgel and Mr. Chevalier were involved in an automobile accident. Mr. Chevalier was operating a fire truck in the course and scope of his employment with SBFD. The parties do not dispute that the accident occurred at the intersection of West Judge Perez Drive and Alexander Avenue in St. Bernard Parish. West Judge Perez Drive is a roadway with two travel lanes that

are unidirectional, and Alexander Avenue is a side street off West Judge Perez Drive with one lane.

Mr. Chevalier, along with Norman Ellis ("Captain Ellis"), a captain with SBFD, were responding to an emergency call when the accident occurred. Captain Ellis was in the passenger seat of the fire truck driven by Mr. Chevalier on the day of the accident.

On October 11, 2012, Mr. Ridgel filed a personal injury claim against Appellants and Lexington Insurance Company, Appellants' liability insurer, for the injuries he sustained from the accident. On October 3, 2018, Mr. Ridgel moved to dismiss Lexington Insurance Company, with prejudice, as a named defendant in the action. On the same day, the trial court dismissed Lexington Insurance Company with prejudice.

A bench trial commenced on October 4, 2018, with the remaining parties— Mr. Ridgel and Appellants. On the same day, the parties jointly stipulated to the following:

> (1) On October 29, 2011, Louis Ridgel was the owner and operator of a 2007 Saturn Vue/Outlook traveling westbound on West Judge Perez Drive, prior to the Intersection at Alexander Avenue, in the Parish of St. Bernard, State of Louisiana; and
>
> (2) On October 29, 2011, the St. Bernard Parish government was the owner of the 2007 KME Fire Truck, operated by defendant, Mitchell Chevalier who at all times herein was in the course and scope of his employment with the St. Bernard Parish Fire Department and who was traveling westbound on West Judge Perez Drive, prior to the intersection at Alexander Avenue, in the Parish of St. Bernard, State of Louisiana.

Additionally, the parties jointly stipulated to the following exhibits:

(1) Exhibit A - State of Louisiana Uniform Motor Vehicle Traffic Crash Report;
(2) Exhibit B - St. Bernard Parish Government's Insurance Policy with Lexington Insurance Company;
(3) Exhibit C in globo - Louis Ridgel's Medical Records;
(4) Exhibit D - Louis Ridgel's Damages Itemization Report;
(5) Exhibit E in globo - Pictures of the Accident Site; and
(6) Exhibit F in globo - Fradella's Collision Center Estimate for Louis Ridgel.

At trial, the following witnesses testified regarding the accident: Deputy Brian Canepa ("Deputy Canepa"), Mr. Chevalier, Captain Ellis, and Mr. Ridgel.

***Deputy Canepa's Testimony***

Deputy Canepa, the responding officer on the scene of the accident, testified to what was stipulated in the police report. While he recalled that the fire truck was traveling eastbound on "Judge Perez Drive," the police report indicates and the parties agree that they were traveling westbound on West Judge Perez Drive.[1] Deputy Canepa testified that he reported the fire truck was driving toward the center of both lanes and that his diagram documented that the fire truck was attempting to make a "wide right turn" off West Judge Perez Drive onto Alexander Avenue. He explained that Alexander Avenue is a narrow road and opined that it would require an emergency vehicle make a "wide right turn" in order to safely turn onto the street. Also, Deputy Canepa recalled Mr. Chevalier stating he was driving in the middle of both lanes.

---

[1] Initially, Deputy Canepa testified from his independent recollection and noted that his police report contained a discrepancy regarding the parties' direction of travel. He testified that, while his police report indicates that the parties were travelling westbound on West Judge Perez Drive, they were actually travelling eastbound.

Deputy Canepa testified that his report indicated that Mr. Ridgel initially stated the fire truck's emergency lights and sirens were on when he noticed the fire truck approaching, but later Mr. Ridgel stated that he did not see any emergency lights or hear sirens. Deputy Canepa testified that he could not personally recall Mr. Ridgel's statements regarding the emergency sirens and lights, but that the inconsistent statements were documented in his report. He testified that he documented the accident as best he could despite Mr. Ridgel's inconsistent statements regarding the emergency lights and sirens. Also, Deputy Canepa could not personally testify as to whether the fire truck's emergency lights and sirens were on when he arrived at the scene. He stated no citations were issued. However, Deputy Canepa testified that, based on the damages on both of the vehicles and the statements of Mr. Chevalier and Mr. Ridgel, the accident was "pretty clear cut," but acknowledged that he did not possess the training to determine fault of the parties.

### Mr. Chevalier's Testimony

Mr. Chevalier testified that he was hired as a firefighter for St. Bernard Parish in August 2010 and became a certified engineer two months prior to the accident in August 2011. He explained that a certified engineer can drive a fire truck.

Mr. Chevalier testified that, on the day of the accident, he was sitting in the fire truck when he received an emergency call. He indicated that Captain Ellis accompanied him on the ride. Mr. Chevalier recounted that, upon gathering all the required information from the emergency call, he turned on the emergency lights, and Captain Ellis turned on the sirens. He testified they pulled out of the station, stopped at the stop sign, and proceeded to drive once he noticed many of the cars

4

yield for them. Mr. Chevalier recounted he made a right on West Judge Perez Drive and immediately entered into the left lane. He testified he traveled to the next block, crossed over the railroad tracks, looked into his rearview mirror, and put on his "blinker" to signal he was turning right on Alexander Avenue. Mr. Chevalier stated that, when he looked in his rearview mirror, he saw a car approaching the railroad tracks behind him in the right lane that appeared to be slowing down, but saw no other cars. He then proceeded to turn on Alexander Avenue. Mr. Chevalier testified he expected the car behind him to slow down because the fire truck had its emergency sirens and lights on. Additionally, Mr. Chevalier noted that the fire truck has a cautionary sign on the back of it that reads, "[s]tay back 500 feet." Mr. Chevalier testified that he, personally, slows down upon seeing an emergency vehicle with a cautionary sign advising motorists to stay a certain distance away.

Further, Mr. Chevalier testified that he was traveling the speed limit, and that he could not have been traveling over the speed limit because the fire truck cannot accelerate fast given its weight and the weight of the gallons of water on the truck. Mr. Chevalier testified that, when he was preparing to turn, he heard a noise. He explained that it was at that time Captain Ellis informed him that he had collided with a passenger vehicle. Mr. Chevalier testified that he could not determine whether the car he saw behind him was the same car involved in the collision. He further testified he and the other driver of the vehicle exited and apologized to each other.

Mr. Chevalier indicated the damage to the fire truck was located by the passenger side rear tire well. He also testified he disagreed with the police report indicating that he was driving in the middle of both lanes, as he recalled he was

driving in the left lane. However, Mr. Chevalier testified that, to make a turn onto Alexander Avenue from the left lane on West Judge Perez Drive, he had to cross the middle of the lanes, crossing over the right lane.

### Captain Ellis' Testimony

Captain Ellis also testified about the accident, and confirmed that he was the passenger in the fire truck with Mr. Chevalier on the day of the accident. He testified the fire truck made a right turn on West Judge Perez Drive and entered into the left lane with the emergency lights and sirens on. He, however, testified that the fire truck could have traveled into the right lane for a short time prior to turning onto Alexander Avenue. Captain Ellis further testified that Mr. Chevalier was not speeding and estimated that Mr. Chevalier was traveling about twenty (20) miles per hour, even though he acknowledged that this estimation was mere speculation as he could not see the odometer from the passenger seat. Captain Ellis stated that he could not confirm whether Mr. Chevalier had his "blinkers" on as he turned onto Alexander Avenue because he could not see. Captain Ellis testified that Mr. Chevalier informed him, however, that his "blinkers" were on at this time.

Captain Ellis testified the first time he was aware that Mr. Chevalier had hit Mr. Ridgel was when he heard the noise as they were turning right onto Alexander Avenue. He stated that he did not see the vehicle prior to making the turn. Captain Ellis testified that he saw Mr. Ridgel once he got out of the fire truck. He stated that Mr. Ridgel's car collided with the fire truck "towards the back wheel well."

### Mr. Ridgel's Testimony

Mr. Ridgel testified about the accident and the property damage to his vehicle, as well as the injuries he sustained as a result of the accident. Mr. Ridgel testified that he was driving westbound in the left lane on West Judge Perez Drive,

approaching the railroad tracks, when the fire truck driven by Mr. Chevalier passed him. He testified the fire truck then pulled into the left lane and almost immediately made a right turn. Mr. Ridgel stated that he pulled into the right lane because the fire truck got so close to his vehicle that he was afraid that he might rear-end it, so he slowed down. He testified that he was originally driving about twenty-five (25) miles per hour and slowed down to twenty (20) miles per hour. Further, Mr. Ridgel testified that he pulled to the side of the road as far as he could, but the fire truck still hit his vehicle. He stated that he could not get over enough to avoid the collision because he would have driven his car into a ditch. Mr. Ridgel testified he had no opportunity to yield because Mr. Chevalier pulled in front of him and immediately slowed down, preparing to turn. Mr. Ridgel further testified Mr. Chevalier's actions caused him to pull over to the right in an effort to avoid hitting the rear of the fire truck.

Mr. Ridgel also testified that he did not see the fire truck turn on any "blinkers," and he did not see any emergency lights nor did he hear sirens. After the collision occurred, he testified that Captain Ellis got out of the fire truck to see if he was okay and apologized, saying that Mr. Chevalier was a "young driver and was inexperienced." He testified that the right rear wheel well of the fire truck hit his left bumper and front quarter panel. Mr. Ridgel testified that he paid a total of $2,551.00 to repair the damages to his car.

Mr. Ridgel testified regarding the injuries he sustained from the accident. He explained that he did not feel pain immediately, but within a couple of days, the pain started. He had pain in his left shoulder, his neck, and "down his shoulder blade through his arm." He testified that he first sought medical treatment about "a week to two weeks" after the accident. He explained that he was trying to provide

7

homecare for the pain, but because the pain worsened, he sought medical treatment. Mr. Ridgel testified he first sought treatment from Dr. Sylvi Beaumont ("Dr. Beaumont"), a chiropractor, who administered physical therapy. Dr. Beaumont referred him to a masseuse for massage therapy. He testified that, at the time he started treatment with Dr. Beaumont, he was unable to work due to his injuries from the accident. He explained he buys homes to renovate and would do most of the work on his own. He testified that his activities were restricted to attending the therapy sessions with Dr. Beaumont.

Mr. Ridgel testified that he stopped seeing Dr. Beaumont in June 2013, and started seeing Dr. John Olson ("Dr. Olson"), a neurologist, who recommended that he receive a Magnetic Resonance Imaging ("MRI") scan of his neck, back, and shoulder. He testified that he could not recall if he went back to Dr. Olson for the results. However, Mr. Ridgel indicated that from June 2013 through September 2015, he did not see any doctors for injuries he sustained from the accident. He explained that he had severe health issues unrelated to the accident that required attention, such as four (4) surgeries for periodontal disease, an enlarged prostate that was recommended for removal, and a partial nephrectomy, in which part of his kidney was removed.

Mr. Ridgel testified that he resumed treatment for his injuries from the accident with Dr. Domingo De Los Reyes ("Dr. De Los Reyes"), a chiropractor, in September 2015. He explained that Dr. De Los Reyes provided "muscle manipulation" treatment and other physical therapy. Mr. Ridgel testified that, at the time of trial, he was receiving treatment from Dr. De Los Reyes. He also testified that he still experienced pain from his injuries.

On October 30, 2018, the trial court rendered its judgment and written reasons:

> (1) Finding Appellants liable, *in solido*, for the automobile accident that occurred on October 29, 2011; and

> (2) Awarding Mr. Ridgel a total of $143,074.00 in damages, including:
>
>> a. $20,523.00 in medical special damages;
>> b. $2,551.00 in property damages; and
>> c. $120,000.00 in general damages.

Appellants now appeal.

## STANDARD OF REVIEW

"Appellate courts review findings of fact made by the trial court judge using the manifestly erroneous or clearly wrong standard of review." *Keller v. Monteleon Hotel*, 2009-1327, p. 2 (La. App. 4 Cir. 6/23/10), 43 So.3d 1041, 1043 (citing *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989)). "[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id.* (Internal citation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id.*

In order for an appellate court to reverse a trial court's finding of fact, an appellate court is required "to find that the findings are not supported by a reasonable factual basis and that the record demonstrates that the findings are clearly wrong." *Id.* (citing *Stobart v. State through Dep't of Transp. and Dev.*, 617 So.2d 880, 882 (La.1993)). Ultimately, the appellate court must determine whether

9

the "factfinder's conclusion was a reasonable one." *Id.*, 2009-1327, p. 2, 43 So.3d at 1042-43.

## DISCUSSION

Appellants raise the following four assignments of error: (1) the trial court erred in concluding that Mr. Chevalier's actions, in relation to the accident, constituted gross negligence; (2) the trial court erred in refusing to apply the doctrine of comparative fault and failing to assess any fault to Mr. Ridgel; (3) the trial court erred in finding that all of Mr. Ridgel's injuries were related to the October 29, 2011 accident and (4) the trial court abused its discretion in awarding Mr. Ridgel $120,000.00 in general damages.

For ease of discussion, we divide our analysis of the issues presented by the assignments of error into the following three categories: (1) liability and allocation of fault; (2) damages; and (3) medical causation.

### *Issue Number 1- Liability and Allocation of Fault*

The fundamental principle of tort liability is that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. C.C.P. art. 2315. This appeal specifically involves the liability of emergency vehicles involved in motor vehicle accidents. Drivers of authorized emergency vehicles are granted privileges when responding to emergencies, if certain provisions are met. La. R.S. 32:24 provides, in pertinent part:

> A. The driver or rider of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.

B. The driver or rider of an authorized emergency vehicle may do any of the following:

(1) Park or stand, irrespective of the provisions of this Chapter.

(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation.

(3) Exceed the maximum speed limits so long as he does not endanger life or property.

(4) Disregard regulations governing the direction of movement or turning in specified directions.

C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle or bicycle is making use of audible or visual signals, including the use of a peace officer cycle rider's whistle, sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.

D. **The foregoing provisions shall not relieve the driver or rider of an authorized vehicle from the duty to drive or ride with due regard for the safety of all persons, nor shall such provisions protect the driver or rider from the consequences of his reckless disregard for the safety of others**.

(Emphasis added).

In *Lenard v. Dilley*, the Louisiana Supreme Court addressed the standard of care set forth in subsection (D) of Louisiana's emergency vehicle statute stating that:

La.Rev.Stat. 32:24(D) sets out two standards of care for an emergency vehicle driver depending on the circumstances of the case. If, and only if, an emergency vehicle driver's actions fit into subsections A, B and C of La.Rev.Stat. 32:24, will an emergency vehicle driver be held liable only for actions which constitute **reckless disregard** for the safety of others. On the other hand, if the emergency vehicle driver's conduct does not fit subsections A, B and C of La.Rev.Stat. 32:24, such

driver's actions will be gauged by a standard of **"due care."**

2001-1522, p. 6 (La. 1/15/02), 805 So.2d 175, 180. (Emphasis added).

The Louisiana Supreme Court has defined "due care" as synonymous with ordinary negligence. *Id.*, 2001-1522, pp.6-7, 805 So.2d at 180. However, the court noted "reckless disregard" is more than severe negligent behavior. *Id.* "Reckless disregard" is, in effect, "gross negligence." *Id.* Gross negligence has been defined by the Louisiana Supreme Court as "the want of even slight care and diligence. It is the want of that diligence which even careless men are accustomed to exercise." *Id.* "Reckless disregard" or "gross negligence" is the standard to be applied if the emergency vehicle driver's actions fit La. R.S. 32:24(A) through La. R.S. 32:24(C). *Id.* Otherwise, the standard is ordinary negligence. *Id.*

In Louisiana, motorists must follow a certain procedure when approaching an authorized emergency vehicle. La. R.S. 32:125 provides, in pertinent part:

> A.    Upon the immediate approach of an authorized emergency vehicle making use of audible or visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.
>
> ***
>
> C. This Section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.

Appellants argue that the trial court erred in concluding the mere negligence of Mr. Chevalier was gross negligence under the emergency responder statute, La.

R.S. 32:24. Further, they argue the trial court should have made a factual determination as to whether the fire truck's emergency lights and sirens were on prior to and at the time of the accident. Appellants also argue the trial court erred in failing to apply the doctrine of comparative fault. We find Appellants' arguments lack merit.

Because Mr. Chevalier failed to keep a proper lookout and made a right turn from the left lane, the trial court determined gross negligence. The trial court relied upon testimonial and documentary evidence offered at trial in making its determination.

Testimony at trial presented contradictory accounts of the accident. Mr. Chevalier testified he was traveling in the left lane prior to making a right turn onto Alexander Street. At trial, he testified that the emergency sirens and lights were on prior to and at the time of the accident. He explained that he turned on his "blinkers" and looked out his rearview mirror to see if any motorists were nearby. He stated that he did not see Mr. Ridgel until after the collision.

Conversely, Mr. Ridgel testified the fire truck was driving more to center of the two lanes. He also testified that he did not see or hear any emergency sirens or lights. The police report, which the parties stipulated was accurate, similarly provided that the fire truck was traveling in the center of the two lanes. This report was corroborated by Deputy Canepa's testimony at trial.

Based on this testimonial evidence, the trial court determined that Mr. Chevalier did not see Mr. Ridgel prior to the collision, and found that this fact confirmed Mr. Chevalier failed to keep a proper lookout. The trial court also noted the photographs of the accident scene revealed a "raised roadway or hill encasing railroad tracks." It determined that this "raised roadway or hill" would have made

it difficult for Mr. Ridgel to see vehicles behind him once he passed the railroad tracks. The trial court found, however, that Mr. Chevalier should have kept a proper lookout for other motorists on the road, specifically because he was making a right turn from the left lane. Further, the trial court determined that the evidence showed that Mr. Chevalier intended to make a quick right turn from the left lane onto West Judge Perez Drive, but did not ensure it was safe to make that right turn. As such, the trial court determined that Mr. Chevalier's actions constituted gross negligence despite the immunity established by La. R.S. 32:24. We agree.

The immunity established in La. R.S. 32:24 does not apply because the trial court found gross negligence based upon Mr. Chevalier's failure to keep a proper lookout. The Louisiana Supreme Court defined "gross negligence" as "the want of even slight care and diligence." *Lenard*, 2001-1522, p. 7, 805 So.2d at 180. Mr. Chevalier admitted he did not see Mr. Ridgel prior to the collision. Mr. Ridgel's testimony and the police report likewise revealed that Mr. Chevalier was traveling more to the center of the both lanes. Testimonial evidence established that Mr. Chevalier attempted to make a right turn from the left lane. Mr. Chevalier testified that he turned on his "blinkers" and looked out of his rearview mirror to view motorists behind him. Captain Ellis testified that he could not confirm whether Mr. Chevalier turned on his "blinkers" when Mr. Chevalier was turning on Alexander Avenue because he could not see. from Based on the evidence, the trial court found that Mr. Chevalier disregarded traffic regulations because he failed to ensure that he could make a right turn with reasonable safety. *See* La. R.S. 32:104.

We find that the trial court's findings of fact are supported by a reasonable factual basis. The trial court properly found that Mr. Chevalier failed to keep a proper lookout and disregarded traffic regulations with "reckless disregard for the

other vehicles around him." Based on our review of the record, we determine that the trial court's findings are not clearly wrong and its conclusion is a reasonable one.

We likewise find that a determination regarding the emergency lights and sirens is not warranted. The standard of care, as set forth in La. R.S. 32:24(D), establishes that the operator of an emergency vehicle must operate that vehicle with "due care." This subsection, specifically, establishes that a driver's actions which are the consequence of "reckless disregard for the safety of others" **shall** not be protected by La. R.S. 32:24. The testimony reveals that Mr. Chevalier did not properly look out for other motorists or monitor traffic as he prepared to turn right onto Alexander Avenue from West Judge Perez Drive; therefore, Mr. Chevalier is not afforded the protection of La. R.S. 32:24. Thus, a determination of whether the emergency lights and sirens were on prior to and at the time of the accident is of no moment. The trial court's determination as to liability is proper.

Next, we address whether the trial court erred in its assessment of fault. "The manifest error standard also governs this court's review of the trial court's findings regarding the allocation of fault." *Urquhart v. Spencer*, 2017-0069, p. 9 (La. App. 4 Cir. 7/27/17), 224 So.3d 1022, 1029 (citing *Beggs v. Harrah's New Orleans Casino*, 2014-0725, pp. 13-14 (La. App. 4 Cir. 1/21/15), 158 So.3d 917, 925). "The jurisprudence is well-settled that appellate courts are required to give great deference to the trial court's allocation of fault and that '[o]nly after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award.'" *Id.*, 2017-0069, p. 9, 224 So.3d at 1029-30 (citing *Fontenot v. Patterson Ins.*, 2009-0669, p. 22 (La. 10/20/09), 23 So.3d 259, 274). "The Supreme Court has analogized an appellate court's allocation of fault

after a finding of manifest error to an appellate review of quantum assessments." *Id.* (citing *Clement v. Frey*, 1995-1119, 1995-1163, p. 7 (La. 1/16/96), 666 So.2d 607, 610-11).

In *Urquhart*, this Court explained that the Louisiana Supreme Court "summarized the standard of review applicable to allocation of fault determinations." *Id.* (citing *Duncan v. Kansas City Southern Railway Co.*, 2000-0066, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680-81). This Court articulated that the Louisiana Supreme Court summarized this standard of review as follows:

> This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion.

*Id.*, 2017-0069, pp. 9-10, 224 So.3d at 1030 (citing *Watson v. Hicks*, 2015-0046, pp. 7-8 (La. App. 4 Cir. 5/27/15), 172 So.3d 655, 663-64) (internal citations omitted).

Appellants argue that the trial court erred in refusing to apply the doctrine of comparative fault, and the trial court did not take into consideration Mr. Ridgel's obligations as set forth in La. R.S. 32:125 in finding liability.

Contrary to Appellants' argument, the trial court did assess fault of both parties, but ultimately found Mr. Chevalier was grossly negligent. The trial court evaluated Mr. Ridgel's obligations pursuant to La. R.S. 32:125, which establishes the procedure to which a motorist must adhere upon approaching an authorized emergency vehicle. The trial court noted that the photographs of the accident scene show a "raised roadway or hill" encasing the railroad tracks that "would have made it difficult for Mr. Ridgel to see any vehicles behind him once he passed the railroad track." Mr. Ridgel's testimony confirmed this determination. He testified that he did not see the fire truck until it passed his car as he approached the railroad tracks. He recounted that the fire truck then entered the left lane in front of him on West Judge Perez Drive, causing him to pull into the right lane to avoid rear-ending the fire truck.

Mr. Ridgel expressed concern that the fire truck, when it entered the left lane, got so close to his vehicle that he pulled into the right lane out of precaution. As Mr. Chevalier prepared to turn, Mr. Ridgel testified that he pulled off to the shoulder of the road to avoid the accident. However, he could not get over too far because he would have driven into a ditch. Based on his testimony and photographs of the accident scene, the trial court determined that Mr. Ridgel did all that he could to avoid the collision with the fire truck.

Additionally, the police report noted that Mr. Chevalier was traveling more to the center of both lanes. Deputy Canepa testified that Mr. Chevalier admitted this fact when he provided his statement at the scene of the accident. Mr. Ridgel's testimony also corroborated this fact. The trial court thus found that the evidence showed that the fire truck was driving more to the center of the road and planned to make a quick right turn, narrowing the available space Mr. Ridgel had to pull over

to the shoulder or yield to the fire truck. The trial court determined that Mr. Ridgel could not adhere to the procedure set forth in La. R.S. 32:125 because he did not have the opportunity to safely pull over to the shoulder or yield to the fire truck. The trial court concluded that Mr. Chevalier "disregarded traffic regulations with reckless disregard for the other vehicles around him."

Based on the evidence, the trial court concluded that Appellants were 100% liable, *in solido*, for the accident, finding Mr. Chevalier grossly negligent and finding Mr. Ridgel free of fault. We conclude the trial court was not manifestly erroneous in allocating 100% fault to Appellants.

### *Issue Number 2- General Damages*

Next, we determine whether the trial court's award of general damages was excessive. Appellants argue that the trial court's general damages award constitutes an abuse of discretion because Mr. Ridgel has an extensive history of back issues prior to this accident, that he had an inexplicable twenty-seven (27) month gap in treatment for his injuries sustained from the accident, and there was a lack of any relation of Mr. Ridgel's treatment with Dr. De Los Reyes to the injuries sustained in this accident.

Louisiana jurisprudence is well-settled that the trier of fact is given great discretion in its assessment of damages. "The standard of review applicable to a general damages award is the abuse of discretion standard." *Bouquet v. Wal-Mart Stores, Inc.*, 2008-0309, p. 4 (La. 4/4/08), 979 So.2d 456, 459 (citing *Anderson v. Welding Testing Lab, Inc.*, 304 So.2d 351, 353, (La. 1974)). In *Bouquet*, the Louisiana Supreme Court articulated that:

> The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the

> evidence firsthand. An appellate court may disturb a damages award only after an articulated analysis of the facts reveals an abuse of discretion. The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. To determine whether the fact finder has abused its discretion, the reviewing court looks first to the facts and circumstances of the particular case.

*Id.*, 2008-0309, pp. 4-5, 979 So.2d at 459. (Internal citations omitted).

"General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Id.*, 2008-0309, p. 4, 979 So.2d at 458 (citing *Duncan v. Kansas City So. Ry. Co.*, 2000-0066, p. 13 (La. 10/30/00), 773 So.2d 670, 682; *Boswell v. Roy O. Martin Lumbar Co.*, 363 So.2d 506, 507 (La. 1978)). "[T]hey 'involve mental or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'" *Duncan*, 2000-0066, p. 13, 773 So.2d at 683 (quoting *Keeth v. Dept. Pub. Safety & Transp.*, 618 So.2d 1154, 1160 (La. App. 2nd Cir. 1993)). "Because reasonable persons frequently disagree about the measure of general damages, such an award may be disturbed on appeal only when 'the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances...'" *Urquhart*, 2017-0069, p. 14, 224 So.3d at 1032 (citing *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La. 1993)). "Each case is different; the particular effects of the particular injury on the particular plaintiff must be considered." *Id.* "Consideration of prior awards to determine whether a judgment is abusively low or excessively high is only appropriate after the appellate court has determined that

an abuse of discretion has occurred." *Id.* (citing *Cone v. National Emergency Services, Inc.*, 1999-0934 (La. 10/29/99), 747 So.2d 1085, 1089).

In the case *sub judice*, the trial court awarded Mr. Ridgel $120,000.00 in general damages for pain and suffering for a seven (7) year period. Appellants argue this amount is excessive because Mr. Ridgel was not under active treatment for that extended amount of time and had pre-existing injuries for a number of years. Thus, they argue that this award exceeds amounts awarded for similar injuries. Before considering prior awards to determine if the trial court's judgment is excessively high, this court must determine if an abuse of discretion has occurred. The initial inquiry, however, "is not guided by awards for similar injuries; rather, our initial inquiry is whether the instant award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." *Duncan*, 2000-0066, p. 14, 773 So.2d at 683.

Prior to this accident, Mr. Ridgel renovated rental properties and performed most of the renovations on his own. As a result of the accident, however, he was unable to work renovating properties. His inability to work has diminished his quality of life. The trial court noted that, even though Mr. Ridgel was not seeking lost wages, his testimony reveals that he cannot work at all renovating properties. He also testified that the accident has limited his ability to perform other activities, such as working out or dancing, and he can only perform limited work.

As it relates to Mr. Ridgel's medical treatment, he testified that he initially did not feel any pain immediately after the accident, but experienced pain a couple of days after the accident. He noted the pain was in his left shoulder, his neck, and "down his shoulder blade through his arm." He tended to this pain at home, hoping

the pain would subside. The trial court noted that Mr. Ridgel applied "cold compresses" to relieve his pain. However, the pain worsened and he sought medical treatment from Dr. Beaumont. Dr. Beaumont's medical notes showed that Mr. Ridgel came to her office complaining of headaches and neck and back pain as a result of the accident. Her notes also revealed that he complained of "insomnia, irritability, tension, and ultimately, depression."

Mr. Ridgel also sought medical treatment from Dr. Olson and Dr. De Los Reyes. The trial court found that Dr. Olson's medical notes showed that Mr. Ridgel had long-term back injuries, but related the aggravation of those injuries to this accident. Thus, Dr. Olson recommended a MRI of Mr. Ridgel's lumbar and cervical spine. The MRI revealed herniated discs and disc bulges in both the lumbar and cervical spine. In particular, in its reasons for judgment, the trial court noted that the MRI revealed the following:

> The cervical MRI had the following impressions:
>
> 1. C6-C7: Right lateral herniated nucleus pulposus (3mm) impressing upon the exiting right C7 nerve root, deforming the cervical spine cord and contributing to right neutral forminal stenosis;
>
> 2. Bilateral neural forminal stenosis due to diffuse bulge of the annulus fibrosis with associated marginal osteophyte formation: C3-C4, C4-C5, C5-C6 and C6-C7.
>
> The lumbar MRI had the following expression:
>
> 1. L5-S1: Central and right paracentral herniated nucleus pulposis with osteophyte formation (4mm) contacting and displacing the right S-1 nerve root posteriorly.
>
> 2. Bilateral neural forminal stenisus due to diffuse bulge of the annulus fibrosis: L3-L4.

In addition to the MRI conducted by Dr. Olson, Dr. De Los Reyes performed diagnostic tests on Mr. Ridgel. In his medical report, Dr. De Los Reyes reported that the diagnostic tests revealed disc bulges at C3-C4, C4-C5 and C5-C6, and a disc herniation at C6-C7 of his cervical spine. As to his lumbar spine, the tests revealed a disc bulge at L3-L4 and a disc herniation at L5-S1. Dr. De Los Reyes also reported that Dr. Olson related Mr. Ridgel's headaches and neck injuries to the accident. Further, Dr. De Los Reyes opined that herniated discs to the lumbar and cervical spine were "directly related to the motor vehicle on October 29, 2011."

Mr. Ridgel testified that he now experiences numbness in his left arm and in his hand, and has constant pain in his neck and shoulders. He also complained of numbness in the back of his leg down to his foot. Mr. Ridgel stated that the pain is not severe all the time, but his pain is constant. On the days when the pain from his injuries is severe, he testified that he is not able to do anything. Further, Mr. Ridgel testified that he did not suffer from neck pain, shoulder pain, or pain in his left arm prior to this accident. However, Mr. Ridgel stated that the herniated discs, which he sustained from the accident, are the reason for his neck, shoulder, and arm pain. At the time of trial, Mr. Ridgel testified that he was still receiving treatment from Dr. De Los Reyes for the injuries he sustained from the accident.

Appellants argue that Mr. Ridgel had pre-existing back injuries for an extensive amount of time and was receiving active treatment for those injuries before the accident. In Louisiana, however, it is well-settled that an accident victim who suffers from a pre-existing condition is not barred "from being compensated for an aggravation or worsening of that condition as a result of the new accident." *Frost v. Carter*, 2013-0375, p. 8 (La. App. 4 Cir. 10/29/14), 140 So.3d 54, 65. A

defendant "takes his victim as he finds him" and "the defendant 'is responsible for all natural and probable consequences of his tortious conduct.'" *Id.*, 2013-0375, pp. 8-9, 140 So.3d at 65. "[I]f the defendant's conduct is responsible for aggravating a pre-existing condition, he must compensate the victim for the full extent of the aggravation, 'even if some or all of the injuries might not have occurred but for the plaintiff's preexisting physical condition, disease, or susceptibility to injury.'" *Id.*, 2013-0375, p. 9, 140 So.3d at 65 (citing *Chavers v. Travis*, 2004-0992, p. 7 (La. App. 4 Cir. 4/20/05), 902 So.2d 389, 394). However, that plaintiff must still prove causation. *Id.*

The record demonstrates that the trial court found that Mr. Ridgel proved causation. The trial court noted Mr. Ridgel acknowledged that he had a long history of back pain, but stated the accident aggravated those injuries. It found that the medical opinions introduced at trial from Mr. Ridgel's treating physicians, Dr. Beaumont, Dr. Olson, and Dr. De Los Reyes document that he sustained injuries from the accident. In particular, Dr. Olson's notes showed Mr. Ridgel's pre-existing back injuries were aggravated as a result of the accident. Dr. De Los Reyes reported that Mr. Ridgel had a pre-existing degenerative disc condition in his lumbar spine, but he opined that the weakened disc bulge was likely ruptured in the accident. The trial court noted that Dr. De Los Reyes' opinion regarding these injuries was based on his belief that disc herniations are traumatic in nature, not degenerative, and "the fact of how the accident occurred and the weight of the fire truck were risk factors for this type of injury." Dr. De Los Reyes concluded that it is "more probable than not" the lumbar and cervical disc bulges were aggravated by the accident.

Thus, based on the testimony and medical evidence, the trial court found that Mr. Ridgel sustained new injuries to his lumbar and cervical spine, and that his pre-existing injuries to those areas were aggravated as a result of accident.

Further, Appellants argue that Mr. Ridgel had a gap in treatment for which he did not explain. Louisiana jurisprudence dictates that the trial court has the discretion to determine whether a gap in treatment should be a factor in determining an award for damages. *Williams v. Mathieu,* 2013-1373, p. 9 (La. App. 4 Cir. 10/29/14), 155 So.3d 54, 60-61; *See also Bernard v. Hartford Ins. Co.*, 2009-71, p. 5 (La. App. 3 Cir. 6/3/09), 12 So.3d 1098, 1102.

Mr. Ridgel explained that the gap in treatment was attributed to medical issues unrelated to the injuries he sustained from the accident. He explained that he had periodontal disease, which caused him to undergo four (4) separate surgeries; that he had an enlarged prostate; and he had a partial nephrectomy, in which part of his kidney was removed. The trial court found that Mr. Ridgel was treated consistently for one (1) year and seven (7) months. The trial court acknowledged that Mr. Ridgel had a gap in treatment, but noted that he resumed treatment, and is presently receiving treatment for his injuries. In making its determination as to damages, the record reflects that the trial court considered the gap in treatment and reduced Mr. Ridgel's award by fifty percent (50%) for the treatment he received from Simply Precise Family Chiropractic. Nevertheless, the trial court found that the following amounts were attributed to Mr. Ridgel's injuries he sustained from the accident on October 29, 2011:

Sylvi Beaumont, D.C.                 $6,301.00
Simply Precise Family Chiropractic $12,947.00 (1/2 of original amount)
Dr. John Olson, M.D.                 $ 425.00
Metairie Imaging, Elmwood MRI       $ 850.00

_____

$20,523.00

A trial court's findings based on "reasonable credibility determinations and factual evaluations" will not be disturbed "unless manifestly erroneous." *Williams*, 2013-1373, p. 9, 155 So.3d at 61 (citing *Keller v. Monteleon Hotel*, 2009-1327, p. 2 (La. App. 4 Cir. 6/23/10), 43 So.3d 1041, 1042). We decline to disturb the trial court's findings as we do not find manifest error.

Our review of the record shows the trial court did not abuse its discretion and made credible determinations based upon the medical evidence and live testimony at trial and awarded general damages appropriately.

Thus, we do not find that the trial court abused its discretion in awarding Mr. Ridgel $120,000.00 in general damages.

***Issue Number 3- Medical Causation***

We last address whether the trial court erred in its finding of medical causation. Appellants argue that the trial court erred in finding that all of Mr. Ridgel's injuries were related to the October 29, 2011 accident.

"In a personal injury action, the plaintiff bears the burden of proving—by preponderance of the evidence—that the injuries sustained were caused by the accident at issue." *Frost*, 2013-0375, p. 7, 140 So.3d at 64 (citing *Maranto v. Goodyear Tire & Rubber Co.*, 1994-2603, p. 3 (La. 2/22/95), 650 So.2d 757, 759). In *Frost,* this Court articulated that, "'[t]he test for determining the causal relationship between an accident and a subsequent injury is whether the plaintiff

proved through medical or lay testimony that it is more probable than not that the subsequent injuries were caused by the accident.'" *Id.*, 2013-0375, pp.7-8, 140 So.3d at 64 (quoting *Chavers*, 2004-0992, p. 7, 902 So.2d at 394). "Proof to a reasonable medical certainty is not required." *Id.* (citing *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993)).

To meet his burden of proof, Mr. Ridgel testified about his injuries and introduced his medical records, to which all parties stipulated as admissible. "A stipulation has the effect of a judicial admission or confession which binds all parties and the court." *Rabathaly v. Breaux*, 1999-244, p. 4 (La. App. 5 Cir. 7/27/99), 738 So.2d 1182, 1184 (citing *Cain v. Aquarius Builders, Inc.*, 1996-66 (La. App. 5 Cir.7/30/96), 680 So.2d 69). Further, "[i]t is well-settled that when a party fails to contemporaneously object to the introduction of objectionable evidence, that party waives the right to complain of the issue on appeal." *Frost*, 2013-0375, p. 15 (La. App. 4 Cir. 4/2/14), 140 So.3d 59, 68 (citing *Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish*, 583 So.2d 443, 448-49 (La.1991)).

In this instant matter, the record reflects that the parties jointly stipulated to the admissibility of Mr. Ridgel's medical records, including the following medical records:

(1)     Metairie Imaging/Elmwood MRI LTD.;
(2)     Dr. Sylvi Beaumont D.C.;
(3)     Dr. John Olson, M.D.;
(4)     Simply Precise Family Chiropractic;
(5)     Blue Cross Blue Shield of Louisiana; and
(6)     Three (3) Dermatome charts of the human spinal cord.

Based on the evidence presented, the trial court found that Mr. Ridgel proved causation as to the following:

Lumbar spine:
- L3-L4 aggravation of a pre-existing bulge
- L5-S1 pre-existing disc bulge caused to herniate
- New right and left sided lumbar radicular pain

Cervical spine:
- C3-C4, C4-C5, C5-C6 aggravation pre-existing bulge
- C6-C7 herniation

Appellants did not present evidence to challenge causation proved by the admitted medical records. Thus, Appellants not only stipulated to the authenticity of Mr. Ridgel's medical records, but to the contents of those records as well. Therefore, they have waived their right to assert as error the finding of causation made by the trial court based upon the medical records and plaintiff's treating physicians' opinions as to causation. Thus, this assignment of error lacks merit.

## DECREE

For the foregoing reasons, we affirm the trial court's judgment, rendered on October 30, 2018, finding Appellants liable, *in solido*, for the accident and awarding Mr. Ridgel a total of $143,074.00 in damages.

**AFFIRMED**